Filed 4/30/19; See Dissenting Opinion

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| In re GREGORY WHITE | E068801 |
| | (Super.Ct.No. RIC1512917) |
| on Habeas Corpus. | OPINION |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus. Richard A. Erwood, Judge. Petition is denied.

John P. Dwyer, under appointment by the Court of Appeal, for Petitioner.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Meagan J. Beale, and Lynne G. McGinnis, Deputy Attorneys General, for Respondent.

Petitioner Gregory White challenges the constitutionality of his conviction for second degree felony murder (Pen. Code, § 187)[1] on the basis of the United States

---

[1] All further citations are to the Penal Code, unless otherwise indicated.

1

Supreme Court's decision in *Johnson v. United States* (2015) __ U.S. __, 135 S.Ct. 2551

(*Johnson*), and seeks relief via a petition for writ of habeas corpus. We have determined

that the petition must be denied on this record.[2]

---

[2] After briefing was complete, this court issued a tentative opinion preparatory to oral argument. The tentative opinion was based on the law existing at the time of petitioner's offense and trial. We became aware that effective January 1, 2019, after the tentative opinion issued but before oral argument, Senate Bill 1437 (2017-2018 Reg. Sess.) (SB 1437) amended sections 188 and 189 and created new section 1170.95. The amendments to sections 188 and 189 together change the felony murder rules and the "natural and probable consequences theory" when convicting a participant in a felony for murder, but who did not actually kill the victim. Of interest here, effective January 1, 2019, the second degree felony-murder rule in California is eliminated. However, the change does not automatically apply to convictions that are final before the effective date, like petitioner's. Instead, section 1170.95 establishes a procedure for such defendants to apply to the sentencing superior court to have their murder conviction vacated and be resentenced on any remaining counts, where certain conditions are met. (§ 1170.95, subd. (a)(1)-(3).) In light of these amendments, the Attorney General filed a letter brief here on January 30, 2019, the week before oral argument, formally providing notice to the court and counsel of the changes. At oral argument on February 5, 2019, counsel for petitioner stated that petitioner had not yet petitioned for relief under SB 1437 but would do so within 14 days. The Attorney General pointed out that until petitioner obtains relief, if he does, he is still subject to the second degree felony-murder conviction; if relief is denied, he remains subject to the conviction and the pre-SB 1437 law. Further, the Attorney General represented that the SB 1437 petition process in superior court is just beginning and that early experience is that the process may take months to complete. Counsel for petitioner did not contradict the time issue. We accept it, arguendo, at face value. Additionally, we are still subject to our Supreme Court's show-cause order on petitioner's challenge under *Johnson*, discussed *post*. It is worth mentioning that SB 1437 does not address either *Johnson* or its constitutional vagueness analysis. In other words, this issue is not moot. Accordingly, we will not hold this decision in abeyance but deny the petition on the merits as discussed herein. Finally, after oral argument and while our opinion was circulating for comment, Division 8 of the Second District Court of Appeal issued its opinion in *People v. Frandsen* (Apr. 4, 2019, B280329) __ Cal.App.5th __ [2019 Cal.App. LEXIS 309] (*Frandsen*), in which that court found that California's second degree felony-murder rule is not unconstitutionally vague under *Johnson*. (*Frandsen*, at *22-*35.) As described herein, our decision need not reach that ultimate constitutional issue and we offer no opinion as to *Frandsen*.

I

FACTUAL BACKGROUND[3]

On October 25, 2000, at approximately 11:00 p.m., petitioner helped his friend, Brian Keith Rhea (Rhea), to "pull" or extract methamphetamine dissolved in a container of Coleman fuel.[4]  The Coleman fuel was left over from a previous methamphetamine manufacture.  Petitioner picked Rhea up at Rhea's home, where he lived with girlfriend Linda Loerch (Loerch).  Petitioner and Rhea were long-time friends, and petitioner was driving Rhea's truck, which he had borrowed.  Both petitioner and Rhea smoked some methamphetamine while Rhea retrieved the leftover Coleman fuel.  Petitioner drove Rhea to the home of Steven Burtness (Burtness).  The area included several other residential trailers.  Petitioner parked at another residence, that of Mr. Hornsby.  Burtness owned a converted school bus used for manufacturing methamphetamine, outfitted with electrical outlets.  Petitioner had obtained Burtness's permission to use the bus, in return for a share of the "pulled" methamphetamine.

Rhea's first attempt, in which he tried to "gas" the methamphetamine out of the Coleman fuel, was unsuccessful and he wanted to try a different method with a hot plate.

---

[3]  The factual background is taken in part from our opinion on petitioner's direct appeal from conviction (*People v. White* (July 12, 2005, E034877) [nonpub. opn.] (*White*)), and from the record of petitioner's trial.  We take judicial notice of the record in E034877 and trial proceedings in case No. RIF94362.  (Evid. Code, § 452, subd. (d).)

[4]  Commonly used for camping, Coleman fuel is a petroleum-based solvent that is highly flammable.  Its use in manufacturing methamphetamine is discussed *post*.

3

Petitioner went to Burtness's trailer and asked to use a hot plate. Burtness directed him to the kitchen or back out to the bus. Petitioner returned to the bus with a hot plate, to find Rhea already using an older hot plate with exposed coils. Rhea was using it to boil off saturated Coleman fuel in a bowl on top of the "antique" hot plate to recover methamphetamine. The back door of the bus was wedged open. Rhea was wearing gloves that had become soaked in the Coleman fuel. As petitioner saw the old hot plate, the bowl containing about a quart of the Coleman fuel cracked and the fuel ran into the red-hot coils, causing a flash fire. The fuel splashed on the ground and flamed up, catching petitioner in the face. Petitioner was burned, but not as severely as Rhea. He ran to get out of the front of the bus. Rhea stepped back out the back of the bus. Rhea was burned more severely and exacerbated it by trying to put out the flames with his glove-covered hand, which was soaked in Coleman fuel and spread the flames on his body. Petitioner tackled him and managed to get the flames out, rolling Rhea and throwing dirt on him. Between Burtness, who had come outside, and petitioner, they put the fire out on the bus; petitioner used a hose to water down Rhea and ease the pain from his burns.

Petitioner and Rhea walked back to the truck but could not find the keys. Petitioner borrowed Burtness's truck. He intended to take Rhea to the hospital, but Rhea wanted to go home. Petitioner was also concerned the hospital might get the truck's license place and he would be tracked down. They went to Rhea's trailer, where Loerch met them. Rhea was in worse pain. Petitioner told Loerch to take Rhea to the hospital

4

and Rhea would say he was burned in an engine backfire. He left; Loerch took Rhea to the hospital. Rhea died later of his injuries. Eventually, petitioner was questioned by law enforcement.

Petitioner was charged in a two-count information with the murder of Rhea (count 1; Pen. Code, § 187) and with manufacturing methamphetamine (count 2; Health & Saf. Code, § 11379.6, subd. (a)). It was further alleged that defendant had one prison prior (Pen. Code, § 667.5, subd. (b)) and had a prior conviction for possessing ephedrine for the manufacture of methamphetamine, an enhancement in count 2 (Health & Saf. Code, §§ 11383, subd. (c) & 11370.2, subd. (b)). (*White*, *supra*, E034877, at p. 2.)

On count 1, the jury was instructed on second degree implied malice murder and second degree felony murder. The evidence showed that an explosion occurred while defendant and Rhea were manufacturing methamphetamine. Rhea suffered extensive second and third degree burns, and later died of his injuries. The jury found defendant guilty of second degree felony murder; guilty as charged in count 2; and found the prison prior and enhancement allegations true. The jury specially found that the murder "occurred during the commission of the crime of manufacturing methamphetamine" and that the murder "was not committed with implied malice." (*White*, *supra*, E034877, at p. 2.)

Petitioner was sentenced to 19 years to life, consisting of 15 years to life on count 1, plus three years for the enhancement on count 2, plus one year for the prison prior. The upper term of seven years was imposed but stayed on count 2. On direct

appeal, we stayed the three-year enhancement on count 2, and otherwise affirmed. (*White*, *supra*, E034877, at pp. 2, 34.)

Petitioner filed his initial petition for writ of habeas corpus on this issue in Riverside Superior Court case No. RIC1512917, after the United States Supreme Court issued its 2015 opinion in *Johnson*. That petition was denied on November 6, 2015. He then filed his habeas petition, including the instant issue, before us in our case No. E065246. We summarily denied the petition on February 3, 2016. Petitioner then filed his habeas petition before the California Supreme Court, in case No. S233265 on March 24, 2016. Respondent filed an informal response in the Supreme Court on August 31, 2016; petitioner, acting in propria persona, filed a reply on October 20, 2016.

On July 26, 2017, the Supreme Court issued the following order: "The Secretary of the Department of Corrections and Rehabilitation is ordered to show cause before the Second Division of the Fourth District Court of Appeal, when the matter is placed on calendar, why petitioner is not entitled to a reversal of his second degree felony murder conviction because the reasoning set forth in *Johnson v. United States* (2015) __ U.S. __ [135 S.Ct. 2551] renders the California second-degree murder[5] rule unconstitutionally vague. (See also Lee, Why California's Second-Degree Felony-Murder Rule is Now Unconstitutionally Vague (2015) Hastings Const. L. Q., Forthcoming; UC Hastings

---

**5** Probably intended to read, "California second-degree *felony* murder rule[.]"

6

Research Paper No. 158.)**[6]** The return is to be filed on or before August 25, 2017." We

appointed counsel in the instant case.

After extensions of time, respondent filed a return on October 12, 2017.

After further extensions of time, petitioner filed a traverse by appointed counsel on

February 26, 2018,**7** followed by a letter notice on May 8, 2018, as to a new United States

Supreme Court case arising from *Johnson*, *Sessions v. Dimaya* (2018) __ U.S. __, 138

S.Ct. 1204 (*Dimaya*), which petitioner contends is applicable to arguments in his traverse.

Petitioner filed a second letter notice on October 17, 2018, as to a new United States

Court of Appeals for the Ninth Circuit case, *Henry v. Spearman* (9th Cir. 2018) 899 F.3d

703 (*Henry*), which he also contends is applicable to arguments in his traverse.

II

DISCUSSION

Petitioner seeks a writ of habeas corpus to vacate his conviction of second

degree felony murder. He contends that the United States Supreme Court's ruling

in *Johnson* that the residual clause of the Armed Career Criminal Act, 18 U.S.C.S.

section 924(e)(2)(B)(ii) (hereafter ACCA), is unconstitutionally vague and fails to meet

---

**6** Now, Evan Tsen Lee, Why California's Second-Degree Felony-Murder Rule is Void for Vagueness (2015) 43 Hastings Const. L.Q. 1 (hereafter, Lee).

**7** The petition (written in pro. per.) included a single-page claim that *Johnson* applies. Petitioner, still acting in pro. per., expanded his argument in his reply to respondent's informal response filed in the Supreme Court. The claim is fleshed out by counsel for the first time in the traverse, relying in part on the Lee article. Petitioner's other claim in Supreme Court case No. S233265 is not included in the Supreme Court's order to show cause, and we do not address it here.

7

the due process requirement of notice to potential defendants but invites arbitrary enforcement by judges, and applies equally to California's second degree felony-murder rule. As we discuss herein, there are some general similarities and some differences between the categorical approach analysis to the ACCA's residual clause that the United States Supreme Court found unconstitutionally vague in *Johnson* and the abstract analysis under California law for the second degree felony-murder rule. However, on this record, we do not find unconstitutional vagueness in petitioner's conviction for second degree felony murder for the death of an accomplice arising out of the felonious manufacture of methamphetamine. Accordingly, we will deny the petition.

The thoughtful dissent would apply *Johnson* to find California's former second degree felony-murder rule unconstitutionally vague in general. ("Under *Johnson*, then, a statute fails to provide ordinary people fair notice of what is criminal when it requires courts to apply an indefinite standard to an abstract construction of a statute that is not tied to their own conduct. This holding condemns few laws, but, in my view, one of them is California second degree felony murder." (Dis. opn. *post*, at p. 5, fn. omitted.) Also, "my view is that our second degree felony-murder law is unconstitutionally vague under *Johnson* because it has a defendant's guilt depend on a court's evaluation of a hypothetical risk posed by an abstract generic version of the offense." (Dis. opn. *post*, at p. 18.) We respect his viewpoint but emphasize again that we limit this decision to *this* record presented before us in *this* case, which we hold does not support such a finding.

8

The dissent contends that the California approach to assessing "inherent dangerousness to human life" is to consider " 'whether the felony "by its very nature . . . cannot be committed without creating a substantial risk that someone will be killed . . . ." [Citations.]' (*People v. Howard* (2005) 34 Cal.4th 1129, 1135 (*Howard*).)" (Dis. opn. *post*, at p. 6.) In making that assessment, courts look to " ' "the elements of the felony *in the abstract*, 'not the "particular" facts of the case,' i.e., not to the defendant's specific conduct." ' " (Dis. opn. *post*, at p. 6.) On that basis, the dissent posits, if there is a way for a felony to be committed without a high probability of death, it cannot be " 'inherently dangerous to human life' " or act as "a predicate for second degree felony murder." (Dis. opn. *post*, at p. 8.)

In *Howard*, for example, our Supreme Court found that a violation of Vehicle Code section 2800.2, " 'driving in willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer' " (*Howard*, *supra*, 34 Cal.4th at p. 1134), specified that the act included without limitation, "driving while fleeing or attempting to elude a pursuing peace officer during which time either three or more violations that are assigned a traffic violation point count under Section 12810 occur, or damage to property occurs." (Veh. Code, § 2800.2, subd. (b).) Our Supreme Court observed that violations assigned points under Vehicle Code section 12810 that "can be committed without endangering human life include driving an unregistered vehicle owned by the driver . . . , driving with a suspended license . . . , driving on a highway at slightly more than 55 miles per hour when a higher speed limit has not been

9

posted . . . , failing to come to a complete stop at a stop sign . . . , and making a right turn without signaling for 100 feet before turning." (*Howard*, at pp. 1137-1138 [Vehicle Code sections omitted].) Because Vehicle Code section 2800.2 could be violated in these ways without being inherently dangerous to human life, "the second degree felony-murder rule does not apply when a killing occurs during a violation of section 2800.2." (*Howard*, at p. 1139.) Similarly, as the dissent correctly points out, this maxim has been applied in *People v. Burroughs* (1984) 35 Cal.3d 824 (practicing medicine without a license under conditions creating a risk of great bodily harm, serious physical or mental illness, or death because the "great bodily injury" could be non-life-threatening); *People v. Henderson* (1977) 19 Cal.3d 86 (felony false imprisonment may be effected by violence, menace, fraud, or deceit under the then-existing Pen. Code, § 237; inherently dangerous when effected by violence or menace, but not if effected by fraud or deceit); and *People v. Caffero* (1989) 207 Cal.App.3d 678 (felony child abuse is not inherently dangerous because "great bodily harm" might not endanger human life).

These cases are distinguishable. First, as we explain, *post*, the determination of "inherent dangerousness to human life" in this methamphetamine manufacturing case is based on expert testimony as to a scientific process in chemistry and physics. It is not, as the dissent suggests, a "hypothetical" evaluation. The " 'defendant's specific conduct,' " *Howard*, *supra*, 34 Cal.4th at p. 1135, was not considered in making this determination. The elements of the felony, manufacturing methamphetamine, were considered but the abstract was made concrete by the expert testimony on the nature and processes involved

10

in the manufacture of the drug. In so doing, the trial court, and we, concluded that felonious manufacturing of methamphetamine is inherently dangerous to human life for purposes of the second degree felony-murder rule. Taking evidence of the dangerousness is supported in precedent discussed herein, including by our Supreme Court. (*People v. Patterson* (1989) 49 Cal.3d 615.)

Moreover, the determination that an individual evading police pursuit in a willful and wanton manner, for example, might still do so without acting with inherent dangerousness to human life arises from the nature of the specified traffic violations in the statute. Thus, failure to signal a turn or to "sedately" speed slightly above the posted speed limit may not be inherently dangerous. In the case of feloniously manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a)), however, there are no such "safe" violations. Suggesting that some individuals have produced many batches of methamphetamine without fire or explosion simply recounts an exercise in experience—yet, gaining experience generally extracts a price. Unlike the case of avoiding police pursuit where any driver regardless of experience could operate his or her vehicle "relatively safely," there is no suggestion that the novice (or even the skilled) methamphetamine maker has or can obtain the experience necessary to manufacture many times before an incident, including death, occurs.

Second, California courts have held felonies inherently dangerous to human life. In addition to our prior manufacturing methamphetamine case in *People v. James* (1998) 62 Cal.App.4th 244 (*James*) discussed *post*, felonies including poisoning with intent to

11

injure (*People v. Mattison* (1971) 4 Cal.3d 177); grossly negligent discharge of a firearm (*People v. Clem* (2000) 78 Cal.App.4th 346, but see, *People v. Robertson* (2004) 34 Cal.4th 156); kidnapping (*People v. Greenberger* (1997) 58 Cal.App.4th 298); and reckless or malicious possession of a destructive device (*People v. Morse* (1992) 2 Cal.App.4th 620 (*Morse*)), are all found inherently dangerous.  In addition, other felonies have been found to be inherently dangerous to human life, such as shooting at an inhabited dwelling (*People v. Hansen* (1994) 9 Cal.4th 300) and shooting at an occupied vehicle (*People v. Tabios* (1998) 67 Cal.App.4th 1) (both Pen. Code, § 246).  *Hansen* was overruled and *Tabios* disapproved by *People v. Chun* (2009) 45 Cal.4th 1172, 1199 (*Chun*), not because their respective felonies were not inherently dangerous to human life, but because they were assaultive in nature, merged with the charged homicide, and thus could not be the basis for second degree felony murder.  That is not implicated here.

Third, one of the dissent's main premises regarding the instant case (as opposed to the bigger picture of second degree felony murder in general) is that conceivably there are ways to manufacture methamphetamine "relatively" safely, meaning that the felony is not a basis for felony murder.  We will address this, but we point out here that we rejected this argument in our prior decision in *James*, *supra*, 62 Cal.App.4th at p. 270 (relying on *Morse*, *supra*, 2 Cal.App.4th at p. 646):  " 'Appellant argues that because there are "*conceivable* [ ] ways of violating the statute that do not necessarily pose a threat to human life" the crime is not inherently dangerous. . . .  [¶]  We must view the *elements* of the offense, not the particular *facts* of the instant offense.  In viewing the

12

elements our task is not to determine if it is *possible* (i.e., "conceivable") to violate the statute without great danger. By such a test no statute would be inherently dangerous. Rather the question is: does a violation of the statute involve a *high probability* of death? [Citation.] If it does, the offense is inherently dangerous.' " Under this "any conceivable" test, any of the long-standing cases finding inherent danger to human life could be invalidated. But, as noted above, in viewing the elements of methamphetamine manufacture, we (and the trial court) also viewed expert testimony on the scientific process of the manufacture, rendering a more concrete view of the felony in place of an abstract. In *James*, we found the felony inherently dangerous to human life on this augmented review, as we do here. We note that the dissent also questions the determination of a "high probability of death." We address that as well.

A.    Standard

"A habeas corpus remedy may be available when relief by direct appeal is inadequate. [Citation.]" (*In re Figueroa* (2018) 4 Cal.5th 576, 587.) Petitions for a writ of habeas corpus are evaluated by asking whether, if the factual allegations are true, the petitioner would be entitled to relief. (*Ibid.*) " 'Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them. [Citation.]' " (*Ibid.*, italics omitted.)

In his traverse, petitioner states for the first time that he is currently released on parole. Accepting this assertion as true, which counsel affirmed at oral argument, as a

13

parolee he is still entitled to habeas review because he remains under restraint, despite not being in physical custody. (*People v. Villa* (2009) 45 Cal.4th 1063, 1069; *People v. Cruz-Lopez* (2018) 27 Cal.App.5th 212, 221.)

B.      Analytical Framework

In *Johnson*, the United States Supreme Court considered the statutory ACCA's ban on firearm possession to certain persons, and how its applicability was determined. It observed, "Federal law forbids certain people—such as convicted felons, persons committed to mental institutions, and drug users—to ship, possess, and receive firearms. § 922(g). In general, the law punishes violation of this ban by up to 10 years' imprisonment. § 924(a)(2). But if the violator has three or more earlier convictions for a 'serious drug offense' or a 'violent felony,' the Armed Career Criminal Act increases his prison term to a minimum of 15 years and a maximum of life. § 924(e)(1); *Johnson v. United States*, 559 U.S. 133, 136, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010). The Act defines 'violent felony' as follows:

'any crime punishable by imprisonment for a term exceeding one year . . . that—

'(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

'(ii) is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*.' § 924(e)(2)(B) (emphasis added)." (*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at pp. 2555-2556].) The italicized portion is the "residual clause" of the ACCA. (*Ibid*.)

14

The Supreme Court explained that the ACCA "requires courts to use a framework known as the categorical approach when deciding whether an offense 'is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.' " (*Id*. at p. 2557.) "Under the categorical approach, a court assesses whether a crime qualifies as a violent felony 'in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion.' [Citation.]" (*Ibid*.)

To do so, a court must "picture the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury. [Citation.]" (*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2557].) This goes beyond determining whether creation of risk is an element of the crime; instead, asking whether the crime involves conduct that presents too much risk of physical injury. (*Ibid*.) Complicating the decision, the inclusion of the enumerated crimes of burglary and extortion take the analysis "beyond evaluating the chances that the physical acts that make up the crime will injure someone," given that burglary and extortion do not normally cause physical injury. (*Ibid*.)

In that light, the Supreme Court found that, first, the residual clause left grave uncertainly about how to estimate the risk posed by a crime by tying that assessment to a judicially imagined " 'ordinary case' " of a crime instead of real-world facts or statutory elements. It questioned how to imagine a criminal's behavior and, further, how the idealized ordinary case of the crime subsequently plays out in assessing potential risk.

15

(*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at pp. 2557-2558].)  Second, the residual clause left uncertainty about how much risk it takes for a crime to qualify as a violent felony.  (*Id*. at p. 2558.)  The United States Supreme Court found that "[b]y combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." (*Ibid*.)  Thus, the United States Supreme Court found the residual clause of the ACCA to be unconstitutionally vague.

In *Dimaya*, the U.S. Supreme Court found a similar constitutional infirmity in the residual clause of the Immigration and Nationality Act (INA).  The U.S. Supreme Court explained, "The INA defines 'aggravated felony' by listing numerous offenses and types of offenses, often with cross-references to federal criminal statutes.  [8 U.S.C.S.] § 1101(a)(43); see *Luna Torres v. Lynch*, 578 U.S. __, __, 136 S.Ct. 1619,[ 1623,] 194 L.Ed.2d 737, 739 (2016).  According to one item on that long list, an aggravated felony includes 'a crime of violence (as defined in section 16 of title 18 . . .) for which the term of imprisonment [is] at least one year.'  § 1101(a)(43)(F).  The specified statute, 18 U.S.C. § 16, provides the federal criminal code's definition of 'crime of violence.'  Its two parts, often known as the elements clause and the residual clause, cover:

'(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

16

'(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'

Section 16(b), the residual clause, is the part of the statute at issue in this case." (*Dimaya*, *supra*, 138 S.Ct. at p. 1211.) The U.S. Supreme Court found 18 U.S.C.S. section 16 structurally similar to 18 U.S.C.S. section 924(e)(2)(B) (ACCA) and its residual clause in subdivision (e)(2)(B)(ii), and subject to the analysis in *Johnson* despite the absence of any enumerated felonies in the INA's subdivision (b). (*Dimaya*, at pp. 1215-1216.) Applying that analysis, the U.S. Supreme Court affirmed the judgment of the United States Court of Appeals for the Ninth Circuit, finding the INA's residual clause unconstitutionally vague. (*Dimaya*, at pp. 1212, 1223.)

In comparison, California's former second degree felony-murder rule, which the California Supreme Court has interpreted as broad statutory language despite its roots in common law (*Chun*, *supra*, 45 Cal.4th at pp. 1181-1188), "makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." (*Id*. at p. 1182.) "First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a

17

felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . .' [Citation.]" (*Chun*, at p. 1182.)[8]

" 'In determining whether a felony is inherently dangerous, the court looks to the elements of the felony in the abstract, "not the 'particular' facts of the case," i.e., not to the defendant's specific conduct. [Citation.]' [Citations.]" (*James*, *supra*, 62 Cal.App.4th at p. 258; see *Chun*, *supra*, 45 Cal.4th at p. 1188 ["Whether a felony is inherently dangerous is determined from the elements of the felony in the abstract, not the particular facts. [Citation.]"].) " ' "This form of [viewed-in-the-abstract] analysis is compelled because there is a killing in every case where the rule might potentially be applied. If in such circumstances a court were to examine the particular facts of the case prior to establishing whether the underlying felony is inherently dangerous, the court might well be led to conclude the rule applicable despite any unfairness which might redound to the defendant by so broad an application: the existence of the dead victim might appear to lead inexorably to the conclusion that the underlying felony is exceptionally hazardous." ' " (*James*, at p. 258, quoting *Patterson*, *supra*, 49 Cal.3d at p. 622.)

As we discuss herein, the California approach also admits of the possibility of taking expert testimony and scientific evidence on the issue of determining whether a felony is inherently dangerous to human life, in the appropriate case.

---

[8] Specifically, the version of section 189 in effect at the time of petitioner's offense stated in pertinent part, "All murder which is perpetrated by means of . . . is murder of the first degree. All other kinds of murders are of the second degree."

18

This comparison highlights some of the differences between the approach taken to analyze prior felonies under the ACCA's residual clause and the approach taken to analyze a current felony under the pre-2019 second degree felony-murder rule. For one thing, the California rule used the actual elements of the crime to create an "abstract" of the felony while the ACCA approach takes two branches. First, the enumerated crimes (burglary, arson, extortion, or involving the use of explosives) are analyzed by hypothesizing a generic crime encompassing how that crime would theoretically be committed across a multitude of jurisdictions and states. Second, crimes under the residual clause (unenumerated crimes involving conduct that presents a serious potential risk of physical injury to another) are analyzed according to the state-based elements of the individual offense. California's former second degree felony-murder rule had no such dichotomy. In fact, discussed further, *post*, the second degree felony-murder rule did not relate to or even contain any specifically enumerated felonies, as does section 924(e)(2)(B)(ii) of the ACCA. The U.S. Supreme Court discussed the need for this approach. The emphasis in the ACCA is on prior *convictions*. That is, specifically, enhancements for prior qualifying violent felonies or drug offenses under the ACCA rests solely on the existence of those prior convictions, not the conduct underlying them. (*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2562].) The Court also considered "the utter impracticability of requiring a sentencing court to reconstruct, long after the original conviction, the conduct underlying that conviction," using as an example a conviction on a guilty plea with no record of the underlying facts. (*Ibid.*) Those prior convictions

19

could be in diverse state and federal jurisdictions with varying elements or qualifying conduct with regard to the laws violated. Such considerations were not present with California's former second degree felony-murder rule.[9]

Further, the very need to consider felonies that "otherwise involves conduct that presents a serious potential risk of physical injury to another" (18 U.S.C.S. § 924(e)(2)(B)(ii)), in light of the specifically enumerated felonies of burglary, arson, extortion, or involving use of explosives, (*ibid.*), was never implicated in California's second degree felony-murder rule, unlike under the Supreme Court's original analysis of the ACCA in *Johnson*. For purposes of second degree felony-murder analysis, the enumerated felonies listed in Penal Code section 189 defined first degree murder (now enumerated in current § 189, subd. (a)). But, "[a]ll other kinds of murder are of the second degree." (Former § 189; now contained in current § 189, subd. (b).) A determination of second degree murder, including felony murder, therefore, was not considered in the light of, or with the need to compare, the enumerated felonies applicable to the wholly separate first degree murder determination. That is different from the approach originally undertaken in *Johnson* under the ACCA. We acknowledge that Professor Lee claims to the contrary in his article. (Lee, 43 Hastings Const. L.Q. at pp. 47-49.) He contends that the sentence quoted immediately above is itself a residual

---

[9] The dissent considers the distinction between prior convictions, for the purpose of sentence enhancements under the ACCA, and current convictions with the dynamics of ongoing trials as "meaningless to a categorical inquiry." (Dis. opn. *post*, at p. 22.) In section II.D., *post*, we point out how the use of expert testimony at trial in cases such as this distinguish this process from the categorical inquiry used in *Johnson*.

clause inviting comparison with the enumerated felonies before it.  However, the residual

clause of the ACCA specifically invokes its enumerated felonies ("burglary, arson, or

extortion, involves use of explosives, or otherwise involves conduct that presents a

serious potential risk of physical injury to another") in defining " 'violent felon[ies].' "[10]

(18 U.S.C.S. § 924(e)(2)(B).)  On the other hand, the enumerated felonies in former

section 189 define first degree murder.  The final sentence of that paragraph, which

Professor Lee argues is the residual clause, strikes out in a different direction, *excluding*

the enumerated felonies comprising first degree murder and defining the *separate* offense

of second degree murder.  We do not see that sentence as a "residual clause."

Notwithstanding, while not trivial, these differences do not form the basis of our

opinion.  Here, petitioner's conviction did not simply rest on an abstract, elements-based

analysis of the inherent dangerousness of the underlying crime, manufacturing

methamphetamine.  Instead, the trial court relied on real-world, concrete *evidence* on the

---

[10] We also agree with the dissent that the more recent U.S. Supreme Court review in *Dimaya*, *supra*, __ U.S. __, 138 S.Ct. 1204, finds it unnecessary to assess unenumerated residual clause crimes in the light of enumerated crimes.  That is because *Dimaya* assesses the INA's reliance on the residual clause definition of " 'crime of violence' " in 18 U.S.C.S. section 16, which does not enumerate any specific crimes. (See discussion, *ante*.)  That does not change our point that the ACCA and the INA each respectively define a single term between their elements clauses and residual clauses (with or without enumerated crimes)—either a "violent felony" (ACCA) or a "crime of violence" (INA).  Both do so to analyze *prior* convictions for the purpose of effectuating either the ACCA or the INA.  California Penal Code section 189 on the other hand, defines two separate crimes—first degree and second degree murder, from which the felony murder rules arise, for the purpose of structuring a trial (or plea, or dismissal) with the attendant admission of evidence, argument, and jury deliberation to arrive at a *current* conviction that is its own end.  While those portions of the ACCA and the INA may be structurally similar, section 189 is not.

21

issue of inherent dangerousness. It simply was not real-world evidence of petitioner's particular facts.

C.     Manufacturing Methamphetamine is Inherently Dangerous to Human Life

We have no difficulty finding inherent dangerousness here. First, in *James*, this court considered the felonious manufacture of methamphetamine as a qualifying inherently dangerous felony for the second degree murder rule. We reasoned that, "Whether a felony is inherently dangerous for purposes of the second degree felony-murder rule is a question of law, or, at a minimum, a mixed question of law and fact, which we review de novo." (*James*, *supra*, 62 Cal.App.4th at p. 259, citing *People v. Taylor* (1992) 6 Cal.App.4th 1084, 1090-1094 (*Taylor*).) In that light, we also considered what evidence we could look to in determining inherent dangerousness. (*Taylor*, at pp. 1090-1094.)

Our review of second degree felony-murder cases found that many cases made the determination of inherent dangerousness to human life on the elements of the respective crime, without resort to other evidence. (*James*, *supra*, 62 Cal.App.4th at pp. 259-260.) However, at the time we decided *James*, at least two cases we reviewed involved considering evidence to make the inherent dangerousness determination. One was *Patterson*, in which our Supreme Court directed the Court of Appeal to remand the matter (whether furnishing cocaine is inherently dangerous to human life) to the trial court to consider "various medical articles and reports that assertedly demonstrate that the offense of furnishing cocaine is sufficiently dangerous to life to constitute an inherently

22

dangerous felony," of which the People had requested the Supreme Court take judicial notice. (*Patterson*, *supra*, 49 Cal.3d at p. 625.)[11] The other was *Taylor*, a case of furnishing phencyclidine (PCP) to a victim who drowned under its influence. (*Taylor*, *supra*, 6 Cal.App.4th at p. 1088.) The trial court had heard expert testimony from both sides at trial regarding whether furnishing PCP is inherently dangerous and ruled that it was an inherently dangerous felony; the jury convicted that defendant of murder on that theory. The Court of Appeal found the issue subject to de novo review and stated, "One might wonder why, if the issue is a question of law to be independently reviewed, the Supreme Court in *People v. Patterson* [ ] ordered the matter remanded to the trial court, and why we did the same here. The answer is that the determination of a 'high probability of death' depends, at least somewhat, on evidence as to the dangerousness of the underlying felony in the abstract, evidence which is best garnered from testimony by experts. Appellate courts have often used evidence gathered by trial courts and referees as the basis for de novo legal rulings." (*Taylor*, at p. 1094; *James*, at p. 261.) Based on these cases, we observed, "*Patterson* and *Taylor* thus permit a court to consider evidence of whether a felony is inherently dangerous. This is a practical necessity when the danger

---

**11** The dissent questions how an ordinary person could be expected to know, or have notice, that an offense had a "high probability" of death in this case if the answer "was not knowable by the Supreme Court" (Dis. opn. *post*, at p. 10) and had to be remanded. Yet, as discussed immediately *post*, matters are routinely remanded to the superior court for evidentiary hearings. The point here is that California's approach, established in part by our Supreme Court in *Patterson*, includes considering evidence on the issue of inherent dangerousness in appropriate cases.

23

claimed to be inherent in the elements of a felony is a matter of scientific, medical or technological expertise, rather than common knowledge." (*James*, at p. 261.)

In fact, we viewed—and still do view—the circumstances in *James* as analogous as to whether a new scientific technique is generally accepted within the relevant scientific community so as to be admissible under the *Kelly*/*Frye* rule.[12] (*James*, *supra*, 62 Cal.App.4th at p. 262.) Necessarily, that viewpoint applies to the instant case as well.

In *James*, the evidence presented in the trial court detailed the various steps in manufacturing methamphetamine, supported by the testimony of several expert witnesses. The most common method is using ephedrine or pseudoephedrine from a medication. (*James*, *supra*, 62 Cal.App.4th at p. 263.) The first step is to extract the ephedrine or pseudoephedrine from the medication, using a solvent such as distilled water, denatured alcohol, Coleman fuel, and acetone. This process may be accelerated with heating; both acetone and Coleman fuel are flammable, adding the risk of a flash fire. (*Ibid*.) The second step is to mix the ephedrine with red phosphorus and hydriodic acid, both dangerous substances, and apply heat for six to 72 hours. (*Ibid*.) Iodine or iodine and muriatic acid are sometimes substituted for hydriodic acid, because it is illegal to possess. (*Ibid*.) The third step converts the product from an acid to a base, generally by adding lye, which produces substantial heat. If not cooled with ice, the solution may splatter. (*Ibid*.) The fourth step extracts methamphetamine with a solvent like Coleman

---

[12] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

24

fuel, trichloroethylene or Freon. (*Ibid*.) The fifth step, called gassing, applies hydrochloric acid or sulfuric acid to rock salt or table salt. The gas produced and applied to the solution causes the methamphetamine to crystalize. (*Ibid*.) A sixth step sometimes used washes the methamphetamine with acetone to make it whiter. (*Ibid*.) Every step of this process is dangerous. Acetone and its vapors, and Coleman fuel and its vapors are extremely flammable; iodine crystals are poisonous; red phosphorus explodes in contact with a flame and creates poisonous gas if overheated, and flames are often present in the manufacture of methamphetamine; the acids described above can burn; and fumes from the chemicals cause lung damage. (*Ibid*.) An alternative method of manufacture other than ephedrine involves the " 'P2P' " (phenyl-2-propanone) method, which uses ether, also volatile and flammable. (*Id*. at p. 264.)

These steps and methods were described in full from real-world crime site investigation and observation, experience and known chemical processes. Several experienced witnesses from the California Department of Justice and elsewhere testified as to details of methamphetamine laboratories and fires/explosions. (*James*, *supra*, 62 Cal.App.4th at p. 264.) In addition, we examined California cases in related areas not involving second degree felony murder, but which detailed the dangers of producing methamphetamine in an unprofessional laboratory. (*Id*. at pp. 265-267.) Further, cases from other jurisdictions also detailed the same dangers. (*Id*. at pp. 268-269.)

Having considered the evidence adduced before the *James* trial court, the testimony of experts on the issue of illicit manufacture of methamphetamine and its

dangers, and the various cases in diverse jurisdictions, we concluded that "the trial court correctly ruled that manufacturing methamphetamine is inherently dangerous to human life for purposes of the second degree felony-murder rule." (*James*, *supra*, 62 Cal.App.4th at p. 271.)

Turning to the instant case, the trial court here cited *James* and built on its foundation with additional expert testimony on the issue of manufacturing methamphetamine, including in the form of "pulling" methamphetamine from leftover, meth-saturated solvent. Sheriff's investigator Thomas Salisbury testified he was involved in meth lab investigations since 1986; was present and assisted in the investigation of "probably 1,000 meth labs to date, typically investigating somewhere in the area of 300 a year"; was intimately familiar with methamphetamine, its use, its packaging and sale and the manner of manufacture based on his interaction with manufacturers and users; and, had personally manufactured methamphetamine five times under controlled conditions. He has testified in court as an expert with regard to methamphetamine labs or methamphetamine lab fires 300 times.

He first described the "Reader's Digest" version of manufacture as, "you get over-the-counter cold medication such as Sudafed or Actifed or something that has the active ingredient pseudoephedrine in it. You take the oxygen molecule away from that pill, away from the pseudoephedrine, and you have methamphetamine. That's the Reader's Digest version." He then continued in detailed steps: crushing the pills and mixing them with a solvent, such as methanol and denatured alcohol; filtering the solution to remove

26

binders in the pills, such as starch; and boiling the flammable liquid so it evaporates, leaving extracted pseudoephedrine.  Next, the extracted pseudoephedrine is mixed with iodine (a poison), red phosphorus (a flammable solid) or hydriodic acid, which are oxidizers, to take the oxygen away and start converting the mix to methamphetamine, adding distilled water as a liquid and venting the mix through a filter such as kitty litter. Then, the resulting mix is cooked for a significant amount of time, depending on how much is being made, and the mix is filtered again to remove the red phosphorous if it is used, because it does not dissolve.  Next, the remaining liquid—called reaction mass liquid—is as acidic as battery acid, a pH of 1, which must be raised by either adding a lot of water or adding lye, with a pH of 14, to result in a mixture around 8 or 9 on the pH scale.  Then, an organic solvent—a petroleum-based distillate such as Coleman fuel, charcoal lighter fluid or Freon—is added so that the majority of the methamphetamine goes from the basic layer into the organic layer.  Then, the liquid form is turned into a powder, typically by creating hydrogen chloride gas using muriatic acid and aluminum foil, which is directed into the liquid to solidify the methamphetamine, which is filtered out and dried.  In an additional step, acetone is added to wash the dried methamphetamine.

Investigator Salisbury also testified that the residue liquid or "waste," such as Coleman fuel, can be saved because it contains leftover dissolved methamphetamine that has not been recovered.  The waste is sometimes re-gassed, or is heated to evaporate it off and recover the residue methamphetamine left behind.  Another alternative is to use a

27

"shaker jar" method in which an acid is slowly dropped into the waste liquid to convert the methamphetamine into a solid.

Investigator Salisbury further testified that "the chances of having a lab fire and explosion at any site is 1 in 5." He also testified that "the most common cause of meth lab explosions from a solvent is either from the initial extraction phase or the later, the solvent out phase where you actually heat up a solvent." [13]

This detailed evidence, presented first in the *James* case, which we reviewed on appeal in 1998, and again in the instant case, ineluctably leads to the conclusion that

---

[13] The dissent also suggests that technological advances might develop a way to make methamphetamine manufacturing less dangerous to human life, invalidating the second degree felony-murder rule under *Howard*. Yet, there are many obsolete laws and legal maxims that fell by the wayside due to technological evolution. (See, e.g., Ruddell and Decker, *Train Robbery: A Retrospective Look at an Obsolete Crime* (2017) 42 Crim. Just. Rev. 333, 2 [check kiting as a type of bank fraud less frequent today due to advances in electronic benefit transfers (EBT) and debit cards].) That still did not invalidate a conviction for the law violated at the time of commission. In the case of methamphetamine manufacturing, we could consider a method of production more prevalent today than at the time of petitioner's fatal fire, though not universal. The newer method is called "shake and bake" or "one pot" methamphetamine laboratories. "Generally, these laboratories are small-scale, easy to conceal, and produce two ounces or less of methamphetamine per batch. The ingredients, which are common household items (e.g. pseudoephedrine/ephedrine tablets, lithium batteries, camp fuel, starting fluid, cold packs, and drain cleaner), are mixed in a container, such as a plastic soda bottle. This provides a portable method of producing small amounts of methamphetamine. 'One-pot' laboratories are *extremely dangerous*, *and*, *in many cases*, *cause fires*, *which can lead to injury and death*." (Drug Enforcement Admin., U.S. Dept. of Justice, 2017 National Drug Threat Assessment (Oct. 2017) pp. 74-75, italics added.) Thus, the ingredients remain hazardous: lithium scavenged from batteries, volatile liquids, and caustic lye, subject to fires and explosions when mixed. Absent actual evidence to the contrary, we do not see this particular technological "advance" as an improvement to the dangerousness to human life inherent in methamphetamine manufacturing.

manufacturing methamphetamine in an unprofessional laboratory is inherently dangerous

to human life.**14**  The trial court here came to that precise determination.  After the People

_____

**14**  The dissent asks us to consider the impact on inherent dangerousness by manufacturing methamphetamine in a more professional setting.  To that end, he suggests that manufacturing (1) in a well-ventilated and equipped laboratory or (2) by a Ph.D. in chemistry could demonstrate that it is possible to manufacture methamphetamine safely, citing *Howard*.  He offers in support a 2005 article titled *SDSU grad indicted on charges he used campus lab to make drugs*, and a 2008 article titled, *Ex-Ph.D student makes a deal in meth, theft case*, involving a University of California at Merced doctoral student. (Dis. opn. *post*, at p. 12, fns. 3, 4.)  The first article alleged a San Diego State University graduate "used a campus laboratory to manufacture methamphetamine, Ecstasy and other drugs," and that additional Ecstasy and fentanyl were recovered at his residence.  The article presents no information from which to infer that the campus environment was any "safer" a venue to manufacture methamphetamine.  (See The San Diego Union-Tribune, *SDSU grad indicted on charges he used campus lab to make drugs* (June 30, 2005) http://www.sandiegouniontribune.com/sdut-sdsu-grad-indicted-on-charges-he-used-campus-lab-2005jun30-story.html [as of April 25, 2019].)  Similarly, the doctoral student in Merced was charged with "felony conspiracy to make meth[amphetamine] and embezzlement" for allegedly stealing "$10,000 in chemicals and equipment from the school" to manufacture methamphetamine.  Again, the article reveals nothing from which to infer that the student was "safely" producing methamphetamine.  In fact, the investigation led to his and other residences where "several thousand dollars worth of glass flasks, vessels, pumps and other equipment, as well as chemicals used in the production of meth" was found.  (See The Modesto Bee, *Ex-Ph.D student makes a deal in meth*, *theft case* (Sept. 27, 2018) <https://www.modbee.com/news/local/crime/ article3114437.html> [as of April 25, 2019].)  Storing chemicals in residences does not seem particularly any safer, despite the student's doctoral candidacy.  The dissent also asks whether the outcome would be different if manufacturing took place in an isolated location, and "Does the law change if, in the next case, the defendant is not someone like Gregory White but instead like Walter White?"  (Dis. opn. *post*, at p. 13 and fn. 5 [citing a Wikipedia entry for the fictional Walter White of the "Breaking Bad" television show]. (See *Walter White* (*Breaking Bad*)—Wikipedia, The Free Encyclopedia <https://en.wikipedia.org/wiki/Walter_White_(Breaking_Bad)> [as of April 25, 2019]).) The comparison to a fictional character is compromised when one realizes that the producers of that series had an interest in ensuring the protagonist—meth-cooking Walter—returned after each episode instead of perhaps perishing in a fire or explosion or from toxic fumes.  Further, while we are reluctant to rely on a Wikipedia article (see *Crispin v. Christian Audigier*, *Inc.* (C.D. Cal. 2010) 717 F.Supp.2d 965, 976, fn. 19 [collecting cases on the unreliability of a "user-generated source" as a legal reference];

29

rested at trial, and before petitioner put on his case and testified, the trial court recessed and discussed the exhibits presented. Defense counsel lodged a section 1118.1 motion for entry of judgment of acquittal for insufficient evidence, which the trial court denied. The judge stated, "I think as to Count 1 there's sufficient evidence both on straight implied malice theory without the second-degree felony murder, that is if 1 in 5 labs blow up or fire results and you're heating volatile solvents, I think that's inherently dangerous. That's perhaps not quite as dramatic as playing Russian roulette, but it's just like playing Russian roulette. And under those circumstances that would support second-degree murder, and the James case out of our county supports it. I would deny it on both bases."

The trial court was correct in relying on *James* for a determination of inherent dangerousness to human life. As we observed there, "On appeal, we review the trial court's determination independently. Once a published appellate opinion holds a felony is (or is not) inherently dangerous, that precedent is controlling, unless and until a litigant makes an offer of proof that technological changes have changed the status of the felony.

---

*Gerritsen v. Warner Bros. Entertainment Inc.* (C.D. Cal. 2015) 112 F.Supp.3d 1011, 1028; *People v. Stamps* (2016) 3 Cal.App.5th 988, 997 [Wikipedia considered as hearsay]), we would point out that the article's abstract of five seasons of the Breaking Bad series indicates several deaths occurred during the fictional Walter's enterprise, if apparently intentional. For example, the article states that in the first season, Walter begins a "cook," only to produce phosphine gas. Phosphine gas is a toxic byproduct of methamphetamine manufacturing that was used as a nerve agent in World War I. (See *People v. Odom* (1991) 226 Cal.App.3d 1028, 1034.) Walter then used the gas to kill one antagonist and incapacitate another, only to garotte him later. Notwithstanding dramatic plot twists, manufacturing in an isolated location is not dispositive of safety, and if an accomplice or other person is killed during the process, exposure to murder charges exists regardless of location. Of course, if no one else is present, there can be no killing for purposes of the second degree felony-murder rule and the issue is moot.

This ensures that the classification of felonies as inherently dangerous is governed by a uniform rule of law. (See *People v. Taylor*, *supra*, 6 Cal.App.4th at p. 1092.)" (*James*, *supra*, 62 Cal.App.4th at p. 263.)[15] Furthermore, *James* provides defendants with notice of their exposure to a murder conviction, satisfying due process.[16]

As we discuss next, this real-world evidence-based determination is unlike the categorical approach in *Johnson*.

D.      *Johnson*'s Finding of Unconstitutionally Vague is not Implicated Here

In this case, and in the predecessor *James* case dealing with manufacturing methamphetamine as an inherently dangerous to human life felony, it was established with scientific precision that such manufacture and its various permutations are in fact

---

[15] The instant issue is presented to us as a petition for writ of habeas corpus, not on appeal, but we find no principled reason to treat the precedent established in *James* any differently.

[16] The dissent expresses concern over due process notice from diverse decisions under the former second degree felony-murder rule. Again, our decision here is based on the record of this case. First, former Sheriff's Deputy James testified at petitioner's trial that in 1996, four years before Rhea's death, "[h]e specifically told [petitioner] about a 1995 incident involving Kathy [*sic*] James. While Kathy James was manufacturing methamphetamine, an explosion occurred that resulted in the death of three of her children. (See *People v. [Kathey Lynn] James* (1998) 62 Cal.App.4th 244, 250.) In response, defendant told [Deputy] James that he was aware of the Kathy James case and of the dangers of manufacturing methamphetamine." (*White*, *supra*, E034877, at pp. 32-33.) Petitioner also testified at his trial and, "[o]n cross-examination, [he] admitted that he had extensive knowledge of the different methods of manufacturing methamphetamine, had been manufacturing the drug for at least 10 years before October 2000, and knew about the dangers of manufacturing methamphetamine." (*Id*. at p. 15.) There is no question on this record that petitioner had not only constructive notice but actual notice that death of another during the felonious manufacture of methamphetamine carries exposure to a murder conviction, or that manufacturing methamphetamine is inherently dangerous to human life.

31

inherently dangerous for the purpose of the second degree felony-murder rule. No mere

categorical approach was involved, limited to either analyzing elements of an

unenumerated felony in a vacuum or hypothesizing a generic felony and how it was

carried out. The process used in the trial courts' determinations was not limited to that in

*Johnson* nor the four predecessor ACCA analysis cases the United States Supreme Court

considered. Those cases were *James v. United States* (2007) 550 U.S. 192; *Begay v.*

*United States* (2008) 553 U.S. 137; *Chambers v. United States* (2009) 555 U.S. 122; and

*Sykes v. United States* (2011) 564 U.S. 1. (See *Johnson*, *supra*, __ U.S. at p. __ [135

S.Ct. at pp. 2558-2559] [comparing predecessor cases].) We are mindful that in

prefacing its discussion of these cases, the United States Supreme Court wondered, "How

does one go about deciding what kind of conduct the 'ordinary case' of a crime involves?

'A statistical analysis of the state reporter? A survey? Expert evidence? Google? Gut

instinct?' [Citation.]" (*Id*. at p. 2557.) None of these four cases embodied the approach

here of expert witness testimony taken as to the dangerousness of a scientific process,

even leaving aside any structural differences between California's former second degree

felony-murder rule and the analyses in *Johnson* and *Dimaya*.

In *James*, *Chambers*, and *Sykes*, the Court concentrated on the level of risk posed

by the crime in question, focusing on comparison to the closest analog among the

enumerated offenses in the ACCA in *James*; and on statistics in *Chambers* and *Sykes*.

(*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at pp. 2558-2559].) In *Begay*, the Court

considered whether drunk driving resembled the enumerated offenses in kind as well as

32

in degree of risk. (*Johnson*, __ U.S. at p. __ [135 S.Ct. at p. 2559].) Ultimately, finding those approaches evidence of the ACCA residual clause's indeterminacy, the Court found that imposing an increased sentence under the residual clause violates due process due to vagueness. (Id. at p. 2563.)[17]

[17] As we noted in section I above, petitioner filed a post-traverse letter pointing out the U.S. Supreme Court's most recent opinion on this issue in *Dimaya*, *supra*, __U.S.__, 138 S.Ct. 1204, and asserting that "[t]he decision is relevant to arguments in White's traverse," but not explaining how that is so. *Dimaya* does not add to petitioner's argument in this case.

Petitioner filed a second letter pointing out the Ninth Circuit's recent opinion in *Henry*, *supra*, 899 F.3d 703, also asserting it relevant to arguments in his traverse. There, the Ninth Circuit considered the request of a California state inmate to file a second or subsequent federal habeas petition pursuant to 28 U.S.C. section 2254, the applicable section of the federal Antiterrorism and Effective Death Penalty Act (AEDPA), and whether that petitioner satisfied the requirements of 28 U.S.C. section 2244(b) to do so. (*Henry*, at p. 705.) The inmate had been convicted of felony discharge of a firearm at an inhabited dwelling and second degree murder in 1996. (*Ibid*.) Because he had previously filed a federal habeas petition under 28 U.S.C. section 2254, he was required to obtain the court of appeals' authorization for the federal district court to consider his successive petition. (*Henry*, at p. 705; 28 U.S.C, § 2241(b)(3)(A).) He requested the second or successive petition to argue that *Johnson* applied to California's second degree felony-murder rule, and that the rule was made void for vagueness thereby. (*Henry*, at p. 707.) The Ninth Circuit found the petitioner made a prima facie showing that his proposed petition relied on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable, and overcame the State's objections. (*Id*. at pp. 707-711.) The Ninth Circuit discussed both the *Johnson* analysis of the ACCA's residual clause and California's second degree felony-murder rule, comparing certain similarities and differences between them, but limited its determination to the request for a successive petition. The Ninth Circuit granted that authorization for a second or subsequent federal habeas petition under the AEDPA, while noting that the demanding standard of 28 U.S.C. section 2254 may cause the petition to ultimately fail "for any number of reasons" not then before that court. (*Id*. at p. 711.) As such, the case involves a procedural determination under the terms of the AEDPA, not a substantive consideration of the *Johnson* second degree felony-murder rule issue raised by petitioner herein. To the extent that the Ninth Circuit found that the argument as to unconstitutionality in *Henry* was "plausible," as the dissent points out, we read it simply in the context of overcoming the AEDPA's bar to a successive federal habeas petition.

The approach taken here, and in our predecessor *James* case, is evidence-based on the specific steps used to manufacture methamphetamine and its objective, inherent dangerousness. It is different in nature and in kind from the categorical approach the United States Supreme Court found unconstitutional in *Johnson*. In fact, the Court noted that, "we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.' " (*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2561], quoting *Nash v. United States* (1913) 229 U.S. 373, 377.) Here, the trial court did precisely that: considered the qualitative standard of "inherently dangerous to human life" to the real-world conduct established by concrete, well-documented scientific expert evidence of the known methods of manufacturing methamphetamine (including "pulling" methamphetamine from its dissolved state in a solvent, specifically including Coleman fuel) and the detailed direct observations and forensic reconstructions of meth lab fires to unavoidably arrive at the determination that manufacturing methamphetamine qualified as an inherently dangerous felony for the purposes of the second degree felony-murder rule.[18]

We further note that *Henry* does not involve the factual and evidentiary considerations, i.e., expert witness testimony as to a scientific process obviating the vagueness issue in *Johnson*, that is central here. Petitioner does not otherwise articulate how *Henry* is relevant, and it does not avail him.

[18] The dissent also suggests that there is no guidance how to determine the likelihood of death from the manufacture of methamphetamine. In one attempt, however,

the dissent cites a study by the Centers for Disease Control and Prevention, *Injuries from Methamphetamine Related Chemical Incidents—Five States*, *2001-2012*. (Dis. opn. *post*, at p. 15 and fn. 6.) That study reviewed 1,325 reports of methamphetamine chemical-related incidents, finding that in 87 of them (seven percent), 162 persons were injured with two deaths. The dissent, admitting that the five states involved (Louisiana, Oregon, Utah, New York, and Wisconsin) did not include California, still questions whether these statistics should constitute a " 'high probability' " of death for purposes of the second degree felony murder rule. (Dis. opn. *post*, at pp. 15-16.) The study itself, however, admits its limitations in this regard. "First, all meth-related incidents for the five states in the database might not have been captured because of the queries used. NTSIP does not include meth incidents in homes unless there is a public health action, such as evacuation. In addition, because of pending legal actions, data on meth-chemical incidents are often difficult to obtain. Second, because states rely on relationships with law enforcement agencies and on scanning media reports, the quality of meth-related chemical incident data differs among states. Finally, trends from the five states cannot be generalized to the entire United States." (Natalia Melnikova et al., *Injuries from Methamphetamine-Related Chemical Incidents—Five States*, *2001-2012* (Aug. 28, 2015), at p. 3 <https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6433a4.htm> [as of April 25, 2019].) These limitations make the data in the CDC's study questionable. For one example, the "pending legal actions" making data difficult to obtain could easily mean that deaths are not consistently reported. Aside from this study, the dissent considers whether expert testimony in the instant case and in *James* sufficiently establishes a "high probability" of death. The dissent refers to sheriff's investigator Salisbury's experience-based testimony that "the chances of having a lab fire and explosion at any site is 1 in 5" as "weakly sourced." (Dis. opn. *post*, at p. 15.) However, Investigator Salisbury attributed the one in five statistic to data compiled by the national organization of the Clandestine Laboratory Investigators Association, from whom he also testified he received part of his formal training. The dissent does not explain how this expert witness testimony is "weakly sourced" on this background. We find Salisbury's testimony supported by substantial evidence and simply observe that " 'the reviewing court must "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 990 [quoting *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125].) Notwithstanding, the dissent relies on two other investigators' experience-based assessments that methamphetamine manufacture can be done " ' "relatively" safely' " and that " '[s]ome "cookers" have produced thousands of batches without an explosion[.]' " (Dis. opn. *post*, at p. 25.) The dissent thus reasons that, under *Howard*, " 'in the abstract, manufacturing methamphetamine is not inherently dangerous.' " (*Ibid*.) Yet, in *James*, the source of these two investigators' testimony, defendant Kathey Lynn James testified that she manufactured methamphetamine " 'in the safest way as possible' . . . , '[o]ne step at a time, which made it a lot more safe and clean' . . . , 'avoid[ed] adding any heat to the

35

This goes well beyond the "categorical approach" of *Johnson* and falls outside any of the four predecessor ACCA cases in which the Supreme Court considered "ordinary cases" of the respective charged crimes and speculated as to how the crimes were committed and whether that means of commission constituted a "violent felony" for the

process, although, when she needed to, she used a lukewarm heating plate,' " and hired two others "to take care of her children so they would not be around when she was 'cooking.' " (*James*, *supra*, 62 Cal.App.4th at p. 256.) She testified she had " 'cooked' " 300 batches of methamphetamine without an explosion or fire. (*Id*. at p. 255.) Notwithstanding this supposedly "safe" method of manufacture, she had a methamphetamine-related fire that killed three of her children, regardless of how many batches she had made over any amount of time. She was convicted of second degree murder and second degree felony murder on all three deaths; manufacturing methamphetamine; and, conspiracy to manufacture. (*Id*. at p. 250.) As we said in our review in *James*, " 'In viewing the elements our task is not to determine if it is *possible* (i.e., "conceivable") to violate the statute without great danger. . . . Rather the question is: does a violation of the statute involve a *high probability* of death?' " (*James*, at p. 270; *Morse*, *supra*, 2 Cal.App.4th at p. 646.) The outcome in *James* is illustrative. Additionally, still in *James*, Gloria Pingrey, special agent of the California Department of Justice, had investigated 50 methamphetamine labs. Two fires had resulted in deaths; in two other cases, toxic fumes had caused death. (*James*, at p. 264.) Another special agent of the California Department of Justice, Ken Riding (one of the investigators on whom the dissent relies), testified that despite any ability to manufacture " 'in a relatively safe way,' " using acetone and Coleman fuel is dangerous because they can be ignited by a hot plate or an open flame and he "knew of 'several' deaths from methamphetamine lab explosions." (*Ibid*.) Returning to the instant case, obviously, a death occurred: Brian Keith Rhea, petitioner White's friend and accomplice. Together with the expert testimony of the process of methamphetamine manufacturing, that is sufficiently precise to inform our decision of inherent dangerousness here. (We have already observed that the trial court in petitioner's case analogized the one in five chances of a fire or explosion to playing Russian roulette—placing a live round in one chamber of a five-chamber revolver, spinning the cylinder, placing the revolver's barrel to the head, and pulling the trigger. After a trigger pull, the hammer may fall on an empty chamber, making that a "relatively safe" result. Luck or poor gun skills might also result in a wound instead of a fatality when a round goes off—a "conceivable" relatively safe outcome. Yet, we find nothing to suggest that playing Russian roulette is other than "inherently dangerous to human life.")

36

ACCA. Here, while not considering the actual facts of petitioner's conduct on October 25, 2000, the superior court had the benefit of a precedential determination in *James* and heard additional expert testimony as well, as contemplated in *James*, including on the necessary processes used in the closely related but shorter manufacturing form of "pulling" dissolved methamphetamine from Coleman fuel. Notably, that "shorter" process is merely a form of a process also described in scientific detail, including with alternative methods, in the expert testimony adduced in *James*. Leaving scant room for doubt or error, it established that the overall process of manufacturing methamphetamine and the shorter subprocess of "pulling" methamphetamine from saturated, leftover residue Coleman fuel is inherently dangerous to human life. In fact, expert testimony adduced in petitioner's trial also established that fires result in about one out of every five attempts to produce methamphetamine, a condition that certainly exceeds the threshold for inherent dangerousness, and that the most common reason for a fire or explosion involves heating a solvent, such as Coleman fuel. This foundation of expert testimony and evidence of real-world scientific processes provides a factual basis, not a hypothesized, categorical or abstract one, for a determination of inherent dangerousness to human life in the felonious manufacture of methamphetamine. That avoids the compounded indeterminacy the United States Supreme Court found violative of due process. (*Johnson*, *supra*, __ U.S. at p. __ [135 S.Ct. at p. 2558].)

Accordingly, we must be "guided by the familiar principle . . . that 'we do not reach constitutional questions unless absolutely required to do so to dispose the matter

37

before us.'  [Citation.]"  (*Facebook*, *Inc. v. Superior Court* (2018) 4 Cal.5th 1245, 1275, fn. 31.)  The due process faults the United States Supreme Court found in categorical analysis of the ACCA's residual clause with regard to prior felonies for the purpose of penalty enhancement are not implicated here, on this record.

## III

## CONCLUSION

We have considered petitioner's arguments, bolstered as they are by Professor Lee's article, and the countervailing ones respondent has offered, in the light of our Supreme Court's direction to consider "why petitioner is not entitled to a reversal of his second degree felony murder conviction because the reasoning set forth in *Johnson* [ ] renders the California second-degree murder rule unconstitutionally vague."  Necessarily, that consideration has been in the light of the record of petitioner's case and the relevant authorities discussed herein.  Given that record, we cannot find that he is entitled to a reversal of his conviction under *Johnson*.

Accordingly, there is no basis for issuing a writ of habeas corpus.

## IV

## DISPOSITION

The petition for writ of habeas corpus is denied.

**CERTIFIED FOR PUBLICATION**

MILLER
_____
J.

I concur:

38

RAMIREZ, P. J.

[*In re Gregory White*—E068801]

RAPHAEL, J., Dissenting.

Under California's second degree felony-murder law, petitioner Gregory White's guilt depended upon an abstract legal issue that had nothing to do with his actions. The trial court had to adjudicate whether California's offense of manufacturing methamphetamine—in general, not in White's case in particular—was "inherently dangerous to human life" such that it qualified as a felony murder predicate. If so, the fact that White's co-conspirator died from burns incurred during the manufacture meant White was guilty of not just the drug crime, but of murdering his accomplice.

Had our Legislature listed methamphetamine manufacture among the crimes that can serve as a predicate for *first* degree felony murder, White would be guilty of murder with no claim that the crime of conviction was unconstitutionally vague. The Legislature would have provided notice to the public and adequately guided the courts. But there is no statutory list of predicate crimes for *second* degree felony murder. A defendant such as White may find out whether his crime qualifies after he committed it, when a court determines whether the crime, taken in the abstract, fits the amorphous inherent-dangerousness-to-life standard.

When it decided *Johnson v. United States* (2015) __ U.S. __ [135 S.Ct. 2551, 192 L.Ed.2d 569], the United States Supreme Court held that a law is unconstitutionally vague if it "require[s] courts to assess the hypothetical risk posed by an abstract generic version of the offense." (*Welch v. United States* (2016) __ U.S. __ [136 S.Ct. 1257, 1264, 194 L.Ed.2d 387].) This was a "new rule" of constitutional law. (*Id.* at p. 1264.)

1

Following *Johnson*, our Supreme Court set an order to show cause in our court for the Attorney General to show why White "is not entitled to reversal of his second degree felony murder conviction because the reasoning set forth in *Johnson* . . . renders the California second-degree [felony] murder rule unconstitutionally vague." Our Supreme Court cited Professor Evan Tsen Lee's law review article, *Why California's Second-Degree Felony-Murder Rule Is Now Void for Vagueness* (2015) 43 Hastings Const. L.Q. 1, UC Hastings Research Paper No. 158. Thereafter, in a different case, a three-judge panel of the United States Court of Appeals for the Ninth Circuit issued a reasoned decision explaining that, for purposes of allowing a defendant to file a second federal habeas corpus petition, the defendant had advanced "a plausible position" that California's second degree felony-murder statute was unconstitutional under *Johnson*. (*Henry v. Spearman* (9th Cir. 2018) 899 F.3d 703, 711.)

I conclude that under *Johnson*, California's second degree felony-murder law is unconstitutionally vague because it requires courts to assess the hypothetical risk posed by an abstract generic version of the offense.

I.

*JOHNSON*'S TWO-PRONGED VAGUENESS TEST

The Due Process Clause of the Fifth Amendment prohibits the government from taking away life, liberty, or property based on a criminal law that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." (*Johnson*, *supra*, 135 S.Ct. at p. 2556, citing *Kolender v. Lawson* (1983) 461 U.S. 352, 357-358.) Because all statutory language leaves some need

2

for interpretation, what is "fair" notice and "so" standardless is a matter of degree. In *Johnson*, the Court identified a type of criminal law—no doubt rare—that was sufficiently unfair and standardless that the Constitution cannot permit it.

*Johnson* addressed one clause in the definition of "violent felony" found in the federal Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B). Known as the "residual clause," that clause used the following italicized language to identify particular prior convictions that would significantly increase a defendant's punishment: those for a crime that "is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." (*Johnson*, *supra*, 135 S.Ct. at pp. 2555-2556.)

The Court held that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." (*Johnson*, *supra*, 135 S.Ct. at p. 2557.) The first feature was that evaluation of the prior crime depended upon an abstract inquiry about the nature of the crime, a framework known as the "categorical approach." (*Ibid.*) That approach tied the assessment of a crime's riskiness to "a judicially imagined 'ordinary case' of a crime," not to how a particular offender committed it. (*Ibid.*) In determining whether a crime carried a sufficient risk of danger to qualify under the residual clause, a court was to imagine the "ordinary case" of the crime and then evaluate its risk. (*Ibid.*) *Johnson*'s problem with the ordinary case construct was that it required an "abstract inquiry" rather than one based on the defendant's actual facts: "The residual clause . . . requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime. Because 'the elements necessary to determine the imaginary ideal are uncertain

3

both in nature and degree of effect,' this abstract inquiry offers significantly less predictability than one '[t]hat deals with the actual, not with an imaginary condition other than the facts.'" (*Id.* at p. 2561; see also *id.* at p. 2563 [prior Supreme Court opinions rejected vagueness challenges to the residual clause based on the imprecision of the phrase "'serious potential risk'" without reaching "the uncertainty introduced by the need to evaluate the riskiness of an abstract ordinary case of a crime"].)

The second feature contributing to the vagueness of the residual clause was the "uncertainty about how much risk" was needed to qualify a crime as a violent felony under the unspecific statutory standard of "'serious potential risk.'" (*Johnson*, *supra*, 135 S.Ct. at p. 2558.) That standard was not vague on its own, but it was problematic when measuring the abstraction of an "ordinary case": "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction." (*Ibid.*; see also *id.* at p. 2561 ["we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct"].)

Thus, *Johnson*'s vagueness test does not affect statutes that occasionally generate a difficult legal issue about whether a defendant's crime falls within their ambit. *Johnson* likewise does not affect statutes that apply an indefinite standard such as "dangerousness" to a defendant's actual conduct. (See *Sessions v. Dimaya* (2018) __ U.S. __ [138 S.Ct. 1204, 1214, 200 L.Ed.2d 549] (*Dimaya*) ["Many perfectly constitutional statutes use imprecise terms like 'serious potential risk' . . . or 'substantial risk.'"].) In all, *Johnson* made clear that its holding that the residual clause was unconstitutionally vague resulted

4

from *both* features it discussed. That is, a criminal statute is constitutionally void for vagueness if it employs a combination of (1) an abstract judicial construct that is (2) evaluated by an uncertain standard. As the Court put it, "[b]y combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates." (*Johnson*, *supra*, 135 S.Ct. at p. 2558.)[1]

## II.

## *JOHNSON*'S TWO PRONGS APPLIED TO

## SECOND DEGREE FELONY MURDER

Under *Johnson*, then, a statute fails to provide ordinary people fair notice of what is criminal when it requires courts to apply an indefinite standard to an abstract construction of a statute that is not tied to their own conduct. This holding condemns few laws, but, in my view, one of them is California second degree felony murder.[2]

---

[1] Importantly as well, apart from *Johnson*'s two-pronged test, the Supreme Court rejected the principle, indicated by some of its prior cases, that "'a statute is void for vagueness only if it is vague in all its applications.'" (*Johnson*, 135 S.Ct. at p. 2561.) This principle has been applied in California as a federal constitutional requirement. (See, e.g., *People v. Morgan* (2007) 42 Cal.4th 593, 606.) Before *Johnson*, the apparent need to prove across-the-board vagueness might have been an impediment to raising or applying a constitutional vagueness challenge to the second degree felony-murder law.

[2] *Johnson* considered whether the residual clause was void for vagueness under the Due Process Clause of the Fifth Amendment (*Johnson*, *supra*, 135 S.Ct. at p. 2556), but the same analysis applies under the Due Process Clause of the Fourteenth Amendment and article I, section 7 of the California Constitution, both of which are

First degree felony murder is defined as a killing committed during the perpetration or attempt to perpetrate any of several specified felonies. (Pen. Code, § 189.) There is nothing unconstitutionally vague about that statute. There is no statutory list of specified felonies, however, for second degree felony murder. In our state, that crime has been judicially defined as "'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189." (*People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*) [quoting *People v. Robertson* (2004) 34 Cal. 4th 156, 164].) The idea is that when a defendant perpetrates a "'felony inherently dangerous to human life,'" the requisite malice for murder is imputed to him when death results. (*Chun*, *supra*, at p. 1184.) As applied by our courts, second degree felony murder carries the same two-pronged flaw as the residual clause at issue in *Johnson*.

A. *Abstract Determination*

As with the "residual clause" found unconstitutionally vague in *Johnson*, courts determine whether a felony is "inherently dangerous to human life" categorically for the felony, independent of the facts of any particular offense. "'In determining whether a felony is inherently dangerous [under the second degree felony-murder rule], the court looks to the elements of the felony *in the abstract*, "not the 'particular' facts of the case," i.e., not to the defendant's specific conduct.' [Citation.] That is, we determine whether the felony 'by its very nature . . . cannot be committed without creating a substantial risk

_____

implicated here. (See *Welch v. United States*, *supra*, 136 S.Ct. at pp. 1261-1262; *People v. Heitzman* (1994) 9 Cal.4th 189, 199.)

6

that someone will be killed . . . .' [Citations.]" (*People v. Howard* (2005) 34 Cal.4th 1129, 1135 (*Howard*).)

For this law, the "very nature" of the felony that a court is to consider does not turn on whether the ordinary case of the felony is dangerous to human life, but rather on whether the felony "possibly could be committed without creating such peril." (*People v. Burroughs* (1984) 35 Cal.3d 824, 830, 833 (*Burroughs*); see *People v. Satchell* (1971) 6 Cal.3d 28, 40 (*Satchell*).)

Thus, the courts are charged with abstractly constructing and then evaluating the possible means of committing the offense to determine whether any such means is not sufficiently dangerous. This approach was applied in *Howard*, *supra*, 34 Cal.4th 1129, the most recent case where our Supreme Court adjudicated whether a particular crime was inherently dangerous for purposes of second degree felony murder. *Howard* addressed whether "driving with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer," in violation of Vehicle Code section 2800.2, was an inherently dangerous felony. (*Howard*, *supra*, at p. 1132.) That felony certainly seems dangerous *ordinarily*: on the facts of *Howard*, the defendant fled pursuing officers in a sport utility vehicle at speeds of up to 90 miles per hour, running stop signs and a red light, and driving on the wrong side of a road, until he collided with another vehicle and killed the driver. (*Ibid*.) Indeed, the felony even appears dangerous by its terms, as it expressly requires as an element the "willful or wanton disregard for the safety of persons or property." (*Ibid.*)

7

Our Supreme Court noted, however, that under the statute, the "'willful or wanton disregard'" element can be met by "*any* flight from an officer during which the motorist commits three traffic violations that are assigned a 'point count.'" (*Howard*, *supra*, 34 Cal.4th at p. 1137.) Such traffic violations include, among others, ones that are relatively nonhazardous: driving with a suspended license, driving slightly more than 55 miles per hour when there is no higher posted speed limit, and making a right turn without signaling for 100 feet before turning. (*Id.* at pp. 1137-1138.) The *possibility* of such a nonhazardous violation was enough for the Supreme Court to conclude "a violation of [Vehicle Code] section 2800.2 is not, in the abstract, inherently dangerous to human life." (*Id.* at pp. 1138-1139.) Thus, because the Supreme Court was able to identify a way that the offense possibly could be committed without a high probability of death, the crime could not serve as a predicate for second degree felony murder.

The Court reasoned similarly in considering the crime of practicing medicine without a license under conditions creating a risk of great bodily harm, serious physical or mental illness, or death. (*Burroughs*, *supra*, 35 Cal.3d at p. 833.) The Court held that this felony was not inherently dangerous to human life, principally because the crime *could* be committed, for example, with the victim suffering great bodily injury by a broken bone, in a manner that is not life-threatening. (*Id.* at p. 831; see also *People v. Henderson* (1977) 19 Cal.3d 86, 94-95 [felony false imprisonment dangerous when accomplished by "violence" or "menace" but not inherently dangerous to life because it also may be accomplished by "fraud or deceit"]; *People v. Caffero* (1989) 207 Cal.App.3d 678, 683 [felony child abuse not inherently dangerous to life because "[i]f the

8

statute may be violated by conduct which does not endanger human life, it is not inherently dangerous to human life."].)

Our Supreme Court's cases not only indicate that the hypothetical "possibility" of committing the offense without danger to life need not be the "ordinary case," but the cases have not required that the possibility be common at all. For instance, the Court has reasoned that possession of a sawed-off shotgun is not inherently dangerous because the possessor may have that firearm as an heirloom, curio, or keepsake rather than as a weapon. (See *Satchell*, *supra*, 6 Cal.3d at p. 42 [statute "makes no distinction between the innocent 'collector' and the hardened criminal"].) That logic did not depend on how common it is for a sawed-off shotgun to be kept as an heirloom, only that it is possible to do so. (Cf. *District of Columbia v. Heller* (2008) 554 U.S. 570, 625 [short-barreled shotguns are "not typically possessed by law-abiding citizens for lawful purposes"].)

Our second degree felony-murder law differs from the residual clause in *Johnson* because our analysis requires judges to cogitate on various possible means of committing the offense rather than on the ordinary case of the offense. In my view, this distinction is not meaningful to constitutional vagueness, as each inquiry requires "a judge-imagined abstraction" (*Johnson*, *supra*, 135 S.Ct. at p. 2561) that is untethered to the conduct of the particular defendant. This is the domain of legal interpretation by lawyers and judges, not of fair notice to ordinary people. (See, e.g., *Howard*, 34 Cal.4th at p. 1141 (conc. & dis. opn. of Brown, J.) [disagreeing with majority on ground that "if any offense should easily qualify as inherently dangerous, Vehicle Code section 2800.2 certainly would"], pp. 1141-1148 (dis. opn. of Baxter, J.) [same].)

9

B.  *Indefinite Standard*

For a felony to be inherently dangerous to human life, our law requires that the abstract version of the offense involved "'a high probability that death will result.'" (*Chun*, *supra*, 45 Cal.4th at p. 1207 [quoting *People v. Hansen* (1994) 9 Cal.4th 300, 309, overruled on another ground in *Chun*, *supra*, at p. 1199]; *People v. Patterson* (1989) 49 Cal.3d 615, 627 (*Patterson*) [establishing "'high probability'" standard because a "less stringent standard would inappropriately expand the scope of the second degree felony-murder rule"].)

This "high probability" test is no less ill-defined than the "serious potential risk" standard found in the residual clause in *Johnson*.  The problem with such a "fuzzy risk standard" (*Dimaya*, *supra*, 138 S.Ct. at p. 1221) is that it allows for a wide range of arguable results in evaluating the danger of any particular abstract of a felony, giving inadequate notice of which crimes are to be punished and creating unpredictable determinations by our courts.  In *Patterson*, for instance, our Supreme Court established the "high probability" test but did not decide whether the offense at issue, furnishing cocaine, met that standard, sending the case to the trial court to evaluate evidence on the matter.  (*Patterson*, *supra*, 49 Cal.3d at pp. 618, 625.)  If the answer to that question was not knowable by the Supreme Court, it was not something that the ordinary person could be expected to know.  A remand for an evidentiary hearing about the facts of a defendant's crime is standard appellate fare.  More unusual, if not unique to California second degree felony murder, is a remand for a court to take evidence, wholly divorced from the defendant's case, to determine whether an offense is criminal.

10

III.

METHAMPHETAMINE MANUFACTURE AS AN

ILLUSTRATION OF INDETERMINACY

Petitioner White's offense, manufacturing methamphetamine, provides a good illustration of the indeterminacy of our state's second degree felony-murder inquiry. The majority concludes that "manufacturing methamphetamine in an unprofessional laboratory is inherently dangerous to human life." (Maj. opn., *ante*, at pp. 28-29.) I do not necessarily disagree with this statement, which makes the application of second degree felony murder to methamphetamine manufacture seem to be an easy case. But I am not convinced that the majority is answering the right question.

Our Supreme Court's "possible means" approach to second degree felony murder requires us to consider *not* the means by which defendant White's cohort *actually* committed the offense—cooking the substance in a cramped unprofessional laboratory— but whether the offense, taken in the abstract, possibly could be committed in a way that is not inherently dangerous to human life. I see two ways that this felony illustrates *Johnson*'s point about the malleability of an abstract felony inquiry.

First, it is not clear why we are to assume the case of an unprofessional laboratory. The offense of manufacturing methamphetamine *could* be accomplished in a well-ventilated, professional laboratory.[3] It could be executed by a trained chemist.[4] In fact,

---

[3] (See The San Diego Union-Tribune, *SDSU grad indicted on charges he used campus lab to make drugs* (June 30, 2005) <https://www.sandiegouniontribune.com/

11

our record indicates that the manufacture would be dramatically safer in such circumstances. The lead law enforcement agent in this case testified that, as part of his training, he had manufactured methamphetamine in controlled settings on five occasions, each time in a certified lab. Presumably, he was not risking his life in doing so. (See *People v. James* (1998) 62 Cal.App.4th 244, 264 [recounting expert testimony that experienced cooks can manufacture methamphetamine relatively safely].) Manufacture by trained chemists in a laboratory, to be sure, is not the ordinary case of methamphetamine manufacturing in California. But we are not charged with evaluating the ordinary case, but whether the offense is, *by its nature*, dangerous to human life. If *Howard* held driving with willful or wanton disregard for safety to be not inherently dangerous due to the possibility that a driver might be driving in that manner without threatening lives, on what basis do we disregard the possibility of a relatively safe manufacture here?

Along these lines, and perhaps more realistic for most criminals than manufacture in a laboratory, methamphetamine could be manufactured in an isolated location such as a field or empty lot—putting no nonparticipants at risk—with those involved in manufacture wearing protective, fire-resistant gear that would drastically reduce the risk of death, even if a fire occurred. I cannot see a basis for us to ignore such a possibility in

sdut-sdsu-grad-indicted-on-charges-he-used-campus-lab-2005jun30-story.html> [as of Apr. 25, 2019].)

   **4**  (See The Modesto Bee, *Ex-Ph.D student makes a deal in meth, theft case* (Sept. 27, 2018) <https://www.modbee.com/news/local/crime/article3114437.html> [as of Apr. 25, 2019].)

considering the inherent dangerous of the offense, unless, contrary to cases such as *Howard*, *Burroughs*, and *Satchell*, we are to consider the ordinary case rather than whether the offense possibly can be committed without a high probability of death. Is the only reason not to consider the "empty lot" scenario that no one has provided testimony that it is possible? Does the law change if, in the next case, the defendant is not someone like Gregory White but instead like Walter White?[5] The uncertainty of this type of hypothetical inquiry is precisely what animated *Johnson*.

The second way that this crime illustrates *Johnson*'s concerns is that the crime of manufacturing methamphetamine "encompasses the initial and intermediate steps carried out to process a controlled substance." (*People v. Coria* (1999) 21 Cal.4th 868, 874; *People v. Hard* (2003) 112 Cal.App.4th 272, 279 ["The scope of the prohibition in [Health & Saf. Code] section 11379.6 is broad because the production of methamphetamine is an incremental, not instantaneous process, often conducted in a piecemeal fashion to avoid detection. [Citation.] Because the police can interrupt production at any stage, the language of [Health & Saf. Code] section 11379.6 should be construed broadly to ensure that a manufacturer will not receive any benefit from police intervention early in the process."].) That means that the statute is violated even by conduct that is not the part of the manufacturing process that might involve an explosion. A defendant could, for example, violate the statute by bringing a large amount of a

---

[5] (See *Walter White* (*Breaking Bad*)—Wikipedia, The Free Encyclopedia <https://en.wikipedia.org/wiki/Walter_White_(Breaking_Bad)> [as of Apr. 25, 2019].) The fictional White was a trained chemist who for a time manufactured methamphetamine in a professional laboratory.

precursor chemical (such as pseudoephedrine) to a place where he expected methamphetamine to be manufactured, only to have the manufacturing plan interrupted by an undercover officer. (Compare, e.g., *People v. Lancellotti* (1993) 19 Cal.App.4th 809, 811 [conviction for manufacturing methamphetamine upheld where the defendant owned a "boxed" laboratory in a storage locker, even though the locker did not contain a piece of equipment and a chemical agent which were necessary for the final step of the manufacturing process].) It is not clear to me why the majority does not use, as an abstract version of the felony, such ways of committing it where there is little chance of explosion.

Finally, on top of these uncertainties about the proper abstract version of the felony of manufacturing methamphetamine, the uncertainty of the second prong of the inherent dangerous inquiry completes the constitutional vagueness problem. We must find that there is a "high probability" that death will result from the abstract version of the felony, yet we have no guidance as to what a high probability is. That uncertain threshold alone causes unpredictability. But the data that is used as evidence underlying any such probability determination—which depends upon what litigants in a particular case choose to introduce—compounds the uncertainty.

In that regard, I share with the majority the view that, when courts consider whether a probability is "high" for these purposes, it is preferable that they act with "scientific precision" in a manner that is "evidence-based." (Maj. opn., *ante*, at p. 31.) The alternative is that judges simply use their subjective instincts. (See *People v. Nichols* (1970) 3 Cal.3d 150, 158 & fn. 3 [stating without explanation that offense of burning a

14

motor vehicle under Penal Code former section 449a was inherently dangerous, though the offense contained no requirement that the vehicle be occupied and the statute criminalized burning various other items, such as a stack of hay].)

The statistical evidence here, however, comes down to weakly sourced testimony from the case agent that about one in five methamphetamine manufacturing crimes results in an explosion. (Maj. opn., *ante*, at p. 28.) Thus, in the instant case, we have no evidence of how often *death* results from methamphetamine manufacture. There surely is some causal connection between the frequency of explosions and the frequency of death. But it is only our gut instincts (or our subjective experiences) that determine whether this connection results a high probability, whatever level that is. Simply to illustrate the type of additional statistical evidence that might instead by considered by a court, I note that a study available on the Federal Centers for Disease Control and Prevention website evaluated 1,325 "meth-related chemical incidents" that were reported in five states (not California) over the 12 years covering 2001–2012, and found that in 87 (or 7 percent of the incidents) persons were injured, and there were a total of two deaths—one person, who might have been a meth cook, was found dead in a laboratory; the second death was of a law enforcement officer.[6]

I do not know whether this study is the best one to rely on if statistical evidence of deaths during methamphetamine were evaluated. If this study were considered, I do not

---

[6] Natalia Melnikova et al., *Injuries from Methamphetamine-Related Chemical Incidents — Five States, 2001–2012* (Aug. 28, 2015) <https://www.cdc.gov/mmwr /preview/mmwrhtml/mm6433a4.htm> (as of Apr. 25, 2019).

know whether two deaths out of thousands of methamphetamine manufacturers should constitute evidence of a "high probability" in our circumstances. I also do not know how one could ever come up with a mortality statistic that reflects an abstract version of felony that is the least hazardous possible way of committing it, rather than reflecting "all" methamphetamine manufactures or the "ordinary" case.

I do know that the uncertainty of these matters is the type of uncertainty identified by the Supreme Court in *Johnson*, which explained how no judicial approach could prevent "the risk comparison required by the residual clause from devolving into guesswork and intuition." (*Johnson*, *supra*, 135 S.Ct. at p. 2559.) These types of policy determinations are normally the domain of the Legislature. There is no statutory vagueness problem when our Legislature considers evidence and opts to add an offense, such as methamphetamine manufacture, to the list of offenses that can be predicates for first degree felony murder. One can find the legislative determination either wise or misguided, but, regardless, the statute is not vague. If a statute defines the crime, citizens have notice of what is criminal, and the courts have a reasonably specific penal law to apply.

But the situation is different where *a court* is charged with applying a loose legal standard to decide what crimes are felony murder predicates, based on the expert testimony or statistical evidence that a particular party thinks to introduce in a particular case. The judicial process is ideal for resolving individual disputes. Expert testimony is typically used to determine whether a particular person committed the crime. Here, in contrast, the majority is using expert testimony to determine, in essence, whether a matter

16

should be criminalized. The logical consequence of such caselaw policymaking is that the criminal law could change if the next party does a better job of marshaling the real-world evidence. This possibility underscores the serious constitutional vagueness problem. Remarkably, in our prior decision on methamphetamine manufacture as a predicate, this court even acknowledged that new expert testimony offered in a subsequent case can change the status of a predicate offense. (See *People v. James*, *supra*, 62 Cal.App.4th at p. 263 ["Once a published appellate opinion holds a felony is (or is not) inherently dangerous, that precedent is controlling, *unless and until a litigant makes an offer of proof that technological changes have changed the status of the felony*"], italics added.) Thus, apparently not only could a defendant be convicted of second degree felony murder where there was no law expressly including his crime at the time of his offense, but he could even be convicted if the law was squarely on his side, but the prosecution put on a better showing of statistical evidence and expert testimony in the next case. I believe this possibility is obviously anathema to the due process concept of fair notice, and it is one illustration of the particular problem with having courts take evidence in individual cases to determine what crimes qualify as second degree felony-murder predicates.

IV.

THE MAJORITY OPINION

As laid out in the preceding sections, my view is that our second degree felony-murder law is unconstitutionally vague under *Johnson* because it has a defendant's guilt depend on a court's evaluation of a hypothetical risk posed by an abstract generic version

17

of the offense. Today's majority opinion eschews arguing the wholly contrary view. Rather than offer a full-throated defense of California's second degree felony-murder rule, the majority emphasizes that it is holding only that "*this* record presented before us in *this* case" does not support a finding of constitutional vagueness. (Maj. opn., *ante*, at p. 8.)**7**

It is not clear that such an "as applied" approach is available for the type of constitutional vagueness identified by *Johnson*. There, the Supreme Court found it "[t]rue enough" that "there will be straightforward cases under the residual clause, because some crimes clearly pose a serious potential risk of physical injury" but nevertheless held the residual clause facially void. (*Johnson*, *supra*, 135 S.Ct. at p. 2560; see *id.* at p. 2561 ["why should the existence of some clearly risky crimes save the residual clause?"]; *id.* at p. 2580 (dis. opn. of Alito, J.) [arguing that the Court erred in "concluding that the residual clause is facially void for vagueness"]; *Henry v. Spearman* (2018) 899 F.3d 703, 709 [Supreme Court "struck down the residual clause in its entirety, even as to 'straightforward cases'"].) While other vagueness challenges, such as those to the breadth of a statute's wording, allow for as-applied challenges, it may be that *Johnson* error differs because it implicates the manner in which courts apply a criminal law to all

---

**7** See also majority opinion, *ante*, at page 2 ["the petition must be denied on this record"], p. 8 ["on this record, we do not find unconstitutional vagueness"], p. 31, fn. 16 ["[a]gain, our decision here is based on the record of this case"], p. 38 ["[t]he due process faults the United States Supreme Court found . . . are not implicated here, on this record"], p. 38 ["consideration has been in the light of the record . . . . Given that record, we cannot find that he is entitled to a reversal of his conviction under *Johnson*."]

18

defendants charged with it. (See *People v. Superior Court* (Apr. 16, 2019) __ Cal.App.5th __ [2019 WL 1615288 at *14] [suggesting that, while an "as applied" test remains for vagueness challenges, *Johnson* appeared to involve an "exceptional statute in which the key defect could be established without examining the statute as applied to the challenger's circumstances"].)

Regardless of whether the majority's "as applied" approach is even a viable possibility, it is important to note that the majority's view here leaves open void-for-vagueness challenges to our state's second degree felony-murder rule as applied to other offenses and other records. Under this view, our state is left not merely with cases where the parties argue about the result of applying the "high probability of death" standard categorically to particular crimes, but where they also contest whether that abstract inquiry reaches some undefined level of unacceptable vagueness to be constitutionally void on the particular record about the particular offense.

Putting the availability of the "as applied" approach aside, I disagree with three ways in which the majority opinion attempts to distinguish *Johnson* and find methamphetamine manufacture inherently dangerous.

A. *The Alleged Structural Differences Between Our Law and the Residual Clause*

In an attempt to distinguish California's second degree felony-murder rule from the federal ACCA residual clause struck down in *Johnson*, the majority alleges some differences between the two laws. (Maj. opn., *ante*, at pp. 19-21.) Though the majority ultimately states that "these differences do not form the basis of our opinion" (*Id.* at p.

19

21), I will nevertheless explain why these differences are not relevant to the vagueness inquiry.

First, the majority finds it significant that the residual clause is one part of a test that has "two branches," including enumerated crimes such as burglary and arson, and the residual clause, which evaluated unenumerated crimes under a "serious potential risk of physical injury to another" standard. (Maj. opn., *ante*, at p. 19.) The majority states that California's second degree felony-rule "had no such dichotomy." (*Ibid.*) The lack of any such dichotomy, however, would not support the constitutionality of California's rule, because *Johnson* approved the constitutionality of the enumerated crimes clause. (*Johnson*, *supra*, 135 S.Ct. at p. 2563.) That is, the fact that California's rule *lacks* a branch that is not vague, containing *only* the portion that is indeterminate, is not helpful to the law. In any event, California *does* have a branch of its felony murder law that enumerates crimes: first degree felony murder, in which the legislature listed crimes such as burglary and arson that provide a predicate for felony murder. Like the ACCA residual clause, the second degree felony-murder rule provides an indeterminate test to identify other unenumerated crimes. And, as with adding enumerated crimes to the valid clause that preceded the residual clause, our state's vagueness problem could be cured if the legislature provided a complete list of qualifying crimes, rather than leaving the status of any unlisted felonies to be determined by courts after charges are filed.

A further dimension to the majority's focus on the ACCA enumerated crimes clause has been held by the United States Supreme Court to be immaterial to a *Johnson* vagueness claim. The majority points out that the California law is not a residual clause

20

defined in part by the enumerated list of crimes that precedes it. (Maj. opn., *ante*, pp. 20-21.) *Johnson*'s two-pronged vagueness analysis, however, does not turn on whether the law at issue combines a list of enumerated crimes with "catch-all" language for similar, unenumerated crimes. In *Dimaya*, *supra*, 138 S.Ct. 1204, the Supreme Court applied *Johnson* in holding that a clause defining the term "crime of violence" was unconstitutionally vague. (*Dimaya*, *supra*, at p. 1211.) Neither the clause struck down in *Dimaya* nor its preceding language "specifically invoke[d] . . . enumerated felonies" (maj. opn., *ante*, at p. 21). Instead, what mattered was whether the law in question "had both an ordinary-case requirement and an ill-defined risk threshold." (*Dimaya*, *supra*, at p. 1223.) "Strip away the enumerated crimes," as Congress did in the clause in question, the Court stated, "and those dual flaws yet remain[,] [a]nd ditto the textual indeterminacy that flows from them." (*Id.* at pp. 1221-1222.)[8] Those dual flaws existed in the language struck down in *Dimaya* just as they do here.

Apart from its focus on the enumerated crimes clause, the majority identifies another difference that is meaningless to a categorical inquiry. The majority notes that the "emphasis in the ACCA is on prior *convictions*." (Maj. opn., *ante*, at p. 19; see *id.* at p. 21, fn. 10 [ACCA analyzed "*prior* convictions," whereas the California rule concerns "*a current* conviction that is its own end"]). But when a test for qualifying an offense

---

**8** *Dimaya* involved 18 U.S.C. § 16, the federal criminal code's definition of "crime of violence" that contained a residual clause the same as the ACCA's clause but no list of enumerated crimes. (*Dimaya*, *supra*, 136 S.Ct. at p. 1211.) The Court concluded that "*Johnson* tells us how to resolve this case" and that "just like ACCA's residual clause, § 16(b) 'produces more unpredictability and arbitrariness than the Due Process Clause tolerates.'" (*Id.* at p. 1223.)

21

under a particular standard is categorical—that is, when it has nothing to do with the particular facts of the defendant's case—it does not matter whether a court is examining a charge or a conviction, past or present.  The only question is whether the offense, analyzed in the abstract, qualifies under the applicable standard.  Because both the ACCA residual clause and California second degree felony murder apply categorical tests, it does not matter to a vagueness inquiry whether prior convictions or current charges are at issue.  There can be no distinction for that reason.

Finally, the majority notes that *Johnson* considered the impracticality of requiring a sentencing court to reconstruct old crimes, which (unlike with the California second degree felony-murder rule) could come from diverse jurisdictions with varying laws. (Maj. opn., *ante*, at pp. 19-20.)  This has nothing to do with the issue before us.  The majority is relying on a passage in *Johnson* that explained—in response to a change urged by dissenting Justices—why the Court was sticking to a categorical approach to the residual clause, rather than focusing on the defendant's particular conduct.  (See *Johnson*, *supra*, 135 S.Ct. at p. 2562.)  It does not matter to our inquiry today *why* either the ACCA or the California test apply a categorical approach that does not evaluate the particular defendant's conduct.  All that matters is that both do so.  That simple fact satisfies the first prong of *Johnson's* two-prong test and thus goes a long way to demonstrating that the inquiries implicate similar constitutional vagueness concerns.

B.  *The Claim That Real-World Evidence Cures* Johnson*'s Ills*

I also am not persuaded by the majority's view that *Johnson*'s constitutional vagueness problems are cured when courts rely "on real-world concrete *evidence* on the

22

issue of inherent dangerousness." (Maj. opn., *ante*, at pp. 21-22.) That evidence here was expert testimony on the crime's dangerousness. (*Id.* at pp. 10, 13, 25-26.) The majority holds that once there is a "foundation of expert testimony" and "real-world scientific" evidence there is no need for a hypothesized or abstract determination of inherent dangerousness, so *Johnson* does not apply. (Maj. opn., *ante*, at p. 37.)

The strength of the real-world evidence of dangerousness and the need for reliance on "a judge-imagined abstraction" of a felony (*Johnson*, *supra*, 135 S.Ct. at p. 2558) are simply different matters. Our second degree felony-murder law requires a "judge-imagined abstraction" not because evidence is lacking, but because courts are prohibited from considering the particular facts of the case before it and must evaluate ways that the offense can be committed. (See *Howard*, *supra*, 34 Cal.4th at p. 1138.) Thus, if a death occurs during a felony that is claimed to be a basis for second degree felony murder, judges must ponder in the abstract whether there is *some* way (or ways) of committing that felony that is sufficiently safe to not carry a "high probability" of death. This endeavor may be uncertain regardless of whether or not scientific evidence of dangerousness of the offense in general, or of its particular applications, is presented.

Over the years, for example, our Court of Appeal has reached differing conclusions as to whether felony child endangerment in violation of Penal Code section 273a is an inherently dangerous felony. (Compare *People v. Shockley* (1978) 79 Cal.App.3d 669, 677 [affirming second degree felony-murder conviction based on a conception that it is inherently dangerous to life to allow a "child to be placed in such a situation that its person or health is endangered"] with *People v. Lee* (1991) 234

23

Cal.App.3d 1214, 1224 [reversing second degree felony-murder conviction in part by hypothesizing an offense that "could include a broken arm or leg" but not jeopardize the life of the child].) This difference in judicial hypothesizing has nothing to do with evidence of the dangerousness of felony child endangerment. It instead has to do with the conceptions judges formulate about the possible ways of violating the statute and the level of abstraction at which the dangerousness of the offense is evaluated. That problem exists in this case because the result can turn on what abstract ways of committing the offense of methamphetamine manufacture a judge imagines. The vagueness problem resulting from "judge-imagined abstractions" applies even when, as here, the trial court relies on statistical or expert testimony in considering whether a felony is inherently dangerous to human life.

       C. *Reliance on* People v. James *in Lieu of the Abstract Felony Inquiry*

       Finally, the majority relies heavily on our *James* opinion, but I am doubtful that citing that opinion clears up the *Johnson* vagueness problem. *James* cannot easily be reconciled with the Supreme Court's opinion in *Howard,* decided several years after this court decided *James*. In *Howard*, our Supreme Court held that the possibility of committing a felony—driving with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer—in a nonhazardous way was enough to render it "not, in the abstract, inherently dangerous to human life." (*Howard*, *supra*, 34 Cal.4th at pp. 1138-1139.) In *James*, two California Department of Justice experts testified that a skilled or experienced methamphetamine cooker could manufacture methamphetamine safely. (*People v. James*, *supra*, 62 Cal.App.4th at p. 264

24

[one expert testified that "an experienced methamphetamine 'cooker,' who knows what he or she is doing, can make methamphetamine using ephedrine 'in a relatively safe way'"; another testified that "methamphetamine can be manufactured 'relatively' safely, 'if the person is very skilled,'" and that "[s]ome 'cookers' have produced thousands of batches without an explosion"].)  Under *Howard*'s approach, this testimony seems adequate to establish that, in the abstract, manufacturing methamphetamine is not inherently dangerous.  The majority's approach ultimately finds it sufficient to tie explosions to methamphetamine manufacture in general.  That approach would render the crime in *Howard* inherently dangerous: after all, many car accidents occur from reckless driving with disregard for safety.  But the crime in *Howard* was held *not* inherently dangerous, even though a lot of accidents result from its commission.  It was not inherently dangerous because "not all violations of [the felony] pose a danger to human life."  (*Howard*, *supra*, at p. 1139.)  It seems to me that the difference between the approaches in these two cases demonstrates the grave uncertainty resulting from requiring courts to analyze abstractions of crimes.

## V.

### *PEOPLE v. FRANDSEN*

While this appeal was under submission, a panel in another Court of Appeal district held in *People v. Frandsen* (Apr. 4, 2019) __ Cal.App.5th __ [2019 W.L. 1486863] (*Frandsen*) that the second degree felony-murder rule is not unconstitutionally vague.  In attempting to steer California's entire rule around *Johnson*'s vagueness test, *Frandsen* takes a different tack than today's majority, which has limited its opinion to

"*this* record presented . . . in *this* case." (Maj. opn., *ante*, at p. 8.) The reasoning in *Frandsen*, however, turns on a misunderstanding of one phrase in *Johnson*.

*Frandsen* correctly recognizes that in assessing whether a crime is inherently dangerous to human life under the second degree felony-murder rule, a California court "looks to the elements of the felony in the abstract, not at the particular facts of the case. [Citations.]" (*Frandsen*, *supra*, __ Cal.App.5th at p. __ [2019 W.L. 1486863 at *10]). Consequently, *Frandsen* correctly construes the California cases that have held *Johnson* inapplicable where a crime requires the court to apply a statutory standard to "real-world facts" underlying the defendant's conviction. (*Frandsen*, *supra*, at *10-11 [discussing *People v. Ledesma* (2017) 14 Cal.App.5th 830 and *People v. White* (2016) 3 Cal.App.5th 433].) A statute that applies a qualitative standard to a defendant's actual conduct—such as a prohibition on "reckless" driving—is not unconstitutionally vague under *Johnson*. (*Johnson*, *supra*, 135 S.Ct. at p. 2561.) Such a law provides the defendant fair notice of the standard under which he will be tried and punished.

But both the ACCA residual clause and California's second degree felony-murder rule do not involve consideration of a defendant's actual conduct. Rather, they both involve a categorical approach that has nothing to do with the defendant; instead, a defendant's liability turns on a court's classifying, under an imprecise standard of risk, the entire crime that he committed. *Frandsen* goes wrong in its attempted manner of distinguishing the two categorical inquiries.

*Frandsen* reads *Johnson* as containing an "[i]mplicit" holding that a categorization rule is not vague if it involves "*consideration of the statutory elements of the crime*."

26

(*Frandsen*, *supra*, 2019 W.L. 1486863 at \*10.)  It reasons that because the California second-degree felony murder rule involves "a statutory elements evaluation of risk," it is not an unconstitutionally vague law under *Johnson*.  (*Frandsen*, *supra*, at \*11).

This construction of *Johnson* is wrong.  *Johnson* did not hold that consideration of the statutory elements of the crime immunizes an inquiry from unconstitutional vagueness.  This is clear because the Supreme Court's test for applying the residual clause—which it articulated repeatedly, including in *Johnson* itself—required the consideration of the elements of the crime.  (See *Johnson*, *supra*, 135 S.Ct. at p. 2564 ["To determine whether an offense falls within the residual clause, we consider 'whether the conduct encompassed by the *elements of the offense*, in the ordinary case, presents a serious potential risk of injury to another.'"], italics added; *Dimaya*, *supra*, 138 S.Ct. at p. 1253 ["the Court held that the categorical approach for the residual clause asks 'whether the conduct encompassed by the *elements of the offense*, in the ordinary case, presents a serious potential risk of injury to another.'"], italics added, original italics omitted; *James v. United States* (2007) 550 U.S. 192, 202 ["we consider whether the *elements of the offense* are of the type that would justify its inclusion within the residual provision"], original italics; *Sykes v. United States* (2011) 564 U.S. 1, 7 [quoting preceding test from *James v. United States*].)  That is, in *Johnson* the Supreme Court invalided a test that involved the "consideration of the statutory elements of the crime."  (*Frandsen*, *supra*, 2019 W.L. 1486863 at \*10, italics omitted.)  For this reason, there is no implicit holding of the type *Frandsen* discerns.  The fact that the California second degree felony-murder

27

inquiry involves consideration of the elements does not mean *Johnson* is inapplicable to it.

Frandsen*'s view came from a misconstruction of a sentence in *Johnson* that stated that the residual clause inquiry was not tied "to real-world facts or *statutory elements*." (*Frandsen*, *supra*, 2019 W.L. 1486863 at *10, citing *Johnson*, *supra*, 135 S.Ct. at p. 2557, original italics.)  In context, *Johnson*'s reference to an inquiry tied to "statutory elements" means one that depends *exclusively* on the elements, leaving little or no room for judicial discretion.  Two paragraphs before this sentence in *Johnson*, the Court explained why it was not invalidating another categorical test in the ACCA.  That test, known as the elements clause, includes felonies that require force as an element.  (See *Welch v. United States*, *supra*, 136 S.Ct. at p. 1261; 18 U.S.C. § 924(e)(2)(B)(i).) *Johnson* stated that with the residual clause, "[t]he court's task goes beyond deciding whether creation of risk is an element of the crime[,] . . . unlike the part of the definition of a violent felony that asks whether the crime 'has as an element the use . . . of physical force.'" (*Johnson*, *supra*, 135 S.Ct. at p. 2557, italics omitted.)  Thus, in distinguishing the residual clause from the elements clause, *Johnson* indicated that a law provides fair notice by stating that crimes containing a particular element (force) qualify for heightened punishment.  This is the context for *Johnson*'s statement a few sentences later distinguishing the residual clause from laws tied to "statutory elements."  (See also *Welch v. United States*, *supra*, 136 S.Ct. at p. 1261 [stating, after defining "elements clause" and "residual clause," that "[i]t is the residual clause that *Johnson* held to be vague and invalid"].)  There is no example in *Johnson* of a satisfactory law that involves mere

28

consideration of the elements. Especially when considered along with the fact that

*Johnson* recognizes that the residual clause itself involved *consideration* of statutory

elements, the sentence that *Frandsen* relies on cannot plausibly be read to mean that a

legal test is protected from constitutional vagueness simply because it considers statutory

elements.[9] A test that depends *exclusively* on the elements, in contrast, is saved by the

second prong of *Johnson's* vagueness test because it does not carry a "fuzzy risk

standard" (*Dimaya*, *supra*, 138 S.Ct. at p. 1221), even if it involves an abstract version of

crimes and thus implicates the first prong of the test.

There *is* a difference between the residual clause inquiry and the second degree

felony-murder one. But it is not whether statutory elements are "considered" as

*Frandsen* stated. It is what the elements are considered *for*. With the residual clause,

courts considered the elements to construct an ordinary case of the offense, which they

then evaluated to see if it carried a serious potential risk of physical injury. For second

degree felony murder, courts consider the elements to determine if they can construct a

least harmful case in which the offense "possibly could be committed without creating" a

high probability of death. (*Burroughs*, *supra*, 35 Cal.3d at p. 830.) A determination that

---

[9] *Johnson* also expressly did not invalidate the portion of the ACCA test found immediately before the residual clause that enumerates certain generic crimes, such as burglary, that are covered by the ACCA. (*Johnson*, *supra*, 135 S.Ct. at p. 2563.) That inquiry also depended exclusively on the elements of the defendant's offense, because "[t]o determine whether a past conviction is for one of those offenses, courts compare the elements of the crime of conviction with the elements of the 'generic' version of the listed offense." (*Mathis v. United States* (2016) 136 S.Ct. 2243, 2247; see also *Stokeling v. United States* (2019) 139 S.Ct. 544, 556 (dis. opn. of Sotomayor, J.) [discussing the valid elements and enumerated clauses, and the invalid residual clause].)

our second degree felony-murder rule is not impermissibly vague must turn on a conclusion that our "possibly could be committed" inquiry provides fair notice of what is criminal, even though the residual clause "ordinary case" inquiry does not. As discussed earlier, I believe that both inquiries are indeterminate. Unlike the vast majority of criminal laws, both of these inquiries turn on the uncertainty of how judges will construe the defendant's offense in the abstract, against a qualitative risk standard.

In this regard, the principal case that *Frandsen* relies upon, *People v. Hansen*, *supra*, 9 Cal.4th 300 (*Hansen*), illustrates the unpredictability of California's "possibly could be committed" inquiry. *Hansen* held that discharging a firearm at an "inhabited dwelling house" (Pen. Code, § 246) is inherently dangerous for the purposes of the second degree felony-murder rule. In holding that the crime is dangerous to human life, the court relied on the fact that people generally are in or around an inhabited building. (*Hansen*, *supra*, at p. 310.) That is the ordinary case. But the test is whether the offense "possibly could be committed" without a high probability of danger to human life. *Hansen* recognized such a possibility: that "a defendant may be guilty of this felony even if, at the time of the shooting, the residents of the inhabited dwelling happen to be absent." (*Id.* at pp. 324-325; see Pen. Code, § 246 ["'inhabited' means currently being used for dwelling purposes, whether occupied or not"].) That means a defendant can commit the crime if, for example, he shoots at a cabin in the woods, knowing its occupant is away. With little explanation, however, *Hansen* rejected the unoccupied dwelling scenario as dispositive, viewing the offense at a high level of abstraction. *Hansen*'s analysis thus underscores the question: How can a litigant have fair notice as to which

30

abstract possibilities will carry the day in court? In other cases, hypothetical possibilities have rendered the second degree felony-murder rule inapplicable. (See, e.g., *People v. Lopez* (1971) 6 Cal.3d 45, 51 [though prosecution argued that offense of escape was inherently dangerous because all escapes invite efforts at apprehension by officers, court rejected that argument by hypothesizing nonviolent escapes, such as one by a "committed inebriate who wanders off from a county road job in search of drink"].)

*Johnson* reviewed the case law concerning the residual clause and determined that judicial "experience" in applying that clause convinced it that the "uncertainties" were intolerable. (*Johnson*, *supra*, 135 S.Ct. at p. 2560.) *Hansen* helps illustrate the same uncertainties in California's second degree felony-murder rule. As in *Johnson*, these differ in kind and degree from the uncertainties that affix to ordinary statutes. At the end of the day, I am not sure there can be a definitive answer to the question as to which abstract test—the residual clause in *Johnson* or California's second degree felony murder-rule—is more vague. Both inquiries require courts to assess hypothetical risks posed by an abstract consideration of offenses, so they are similarly malleable and unpredictable. The two inquiries cannot be cleanly distinguished in the manner that *Frandsen* attempts.

VI.

CONCLUSION

Our Supreme Court has not yet considered the second degree felony-murder law in light of the U.S. Supreme Court's new vagueness rule in *Johnson*. In a manner not previously articulated, *Johnson*'s two-pronged vagueness test delineates what makes our

31

rule unconstitutionally uncertain. Because *Johnson* requires a finding of unconstitutional vagueness only when guilt depends on creating an abstraction of a crime divorced from the defendant's actual conduct, and then using an indefinite standard to evaluate the abstraction, it implicates only laws on the periphery of our Penal Code, if any others exist at all. Our courts surely will have few occasions where *Johnson* requires us to invalidate a statute. But *Johnson* could have been written about our second degree felony-murder law. That law embodies both inadequate notice to perpetrators and an indefinite standard for the courts. Under a straightforward application of *Johnson*, the law fails to comport with due process.

                                    RAPHAEL
                                                          J.